# United States Court of Appeals
## For the First Circuit

_____

No. 01-2595


RICHARD A. DAYNARD,

Plaintiff, Appellant,

v.

NESS, MOTLEY, LOADHOLT, RICHARDSON & POOLE, P.A.;
RONALD L. MOTLEY,

Defendants,

SCRUGGS, MILLETTE, BOZEMAN & DENT P.A.;
RICHARD F. SCRUGGS,

Defendants, Appellees.


_____


APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

_____


Before

Lynch, Circuit Judge,
Campbell and Bownes, Senior Circuit Judges.


_____

Edward J. Barshak with whom Darrel C. Waugh and Sugarman, Rogers, Barshak & Cohen, P.C. were on brief for appellant.

Stephen M. Prignano with whom Mark A. Pogue and Edwards & Angell, LLP were on brief for appellees.

_____

May 10, 2002
_____

**LYNCH, Circuit Judge**.  The issue on appeal is whether a federal district court sitting in Massachusetts has specific personal jurisdiction over a suit brought by Richard A. Daynard, a Massachusetts law professor, for fees in the tobacco litigation, against the Mississippi law firm of Scruggs, Millette, Bozeman & Dent, and Richard Scruggs, a senior partner ("Scruggs defendants").  At the heart of Daynard's claim is the argument that the court may reach the Scruggs defendants based in large part on contacts imputed from the South Carolina law firm of Ness, Motley, Loadholt, Richardson & Poole, and Ronald Motley ("Motley defendants"), all of whom purportedly acted on behalf of both firms in engaging Daynard to work on litigation against the tobacco industry.  We conclude, contrary to the district court, that the Scruggs defendants are subject to specific personal jurisdiction based on their contacts with Massachusetts, particularly those contacts properly attributed to them from the Motley defendants, who are also defendants in this litigation.

Daynard is a law professor at Northeastern University specializing in litigation against the tobacco industry.  He sued the Motley and Scruggs defendants, claiming that, pursuant

-2-

to an oral agreement, he is entitled to a portion of the fees that these firms have received or will receive from their successful tobacco litigation.

The Motley defendants, based on their Massachusetts contacts, concede personal jurisdiction, but, central to this case, the Scruggs defendants do not. Daynard does not challenge the district court's conclusion that the Scruggs defendants' own direct contacts with Massachusetts are, by themselves, insufficient to permit personal jurisdiction. Instead, he challenges the district court's ruling that personal jurisdiction does not exist based on the imputation of some of the Motley defendants' contacts, which were purportedly made on behalf of both law firms, to the Scruggs defendants. The district court reasoned that the Motley defendants were not the Scruggs defendants' agents, and, even if they were, the Scruggs defendants did not exert "substantial influence" over the Motley defendants' in-forum activities. The district court reasoned that it could not, consistent with the Due Process Clause of the Fourteenth Amendment, attribute the Motley defendants' contacts to the Scruggs defendants for purposes of personal jurisdiction.

Daynard appeals this decision arguing that the district court erred by relying on a general jurisdiction case, <u>Donatelli</u> v. <u>National Hockey League</u>, 893 F.2d 459 (1st Cir. 1990), to derive the "substantial influence" requirement. Daynard argues that he need not show, for specific jurisdiction purposes, that the Scruggs defendants exerted substantial influence over the Motley defendants' in-forum activities in order to impute the Motley defendants' contacts to the Scruggs defendants. Daynard asserts that the defendants were engaged in a tobacco litigation joint venture and that, on this basis, attribution is proper.

We conclude that <u>Donatelli</u>'s substantial influence test is not controlling in this case, where Daynard alleges that the defendants were in a joint venture, or at least held themselves out to be in a type of agency relationship. We need not determine whether the defendants were actually engaged in a joint venture between themselves, however. The facts, as asserted by Daynard and construed in the light of whether he has made a prima facie jurisdictional showing, suffice to show a relationship between the two defendants sufficient to impute some of the Motley defendants' contacts to the Scruggs defendants. These same facts show that the Scruggs defendants

-4-

held themselves out to be in some form of an agency relationship with the Motley defendants and, by accepting and encouraging Daynard's services, and agreeing to compensate him on the basis of a share of the fees, ratified the Motley defendants' in-forum activities giving rise to this lawsuit.

Traditional common law concepts, embodied in the law of Massachusetts, Mississippi, and South Carolina, confirm the fundamental fairness of requiring the Scruggs defendants to answer in Massachusetts. We conclude that the Scruggs defendants' contacts with Massachusetts, particularly those contacts of the Motley defendants properly attributed to the Scruggs defendants, suffice to permit personal jurisdiction over the Scruggs defendants consistent with the Massachusetts long-arm statute and the Fourteenth Amendment of the Constitution.

**I.**

In this case there are many disputed, and as of yet unresolved, facts. We do not resolve these disputed facts because we "must accept the plaintiff's (properly documented) evidentiary proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing." Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 145 (1st

Cir. 1995). We use Daynard's version of the facts (although we provide a brief description of the defendants' competing version), drawn from his complaint, both sides' subsequent affidavits, and the products of jurisdictional discovery, including Daynard's deposition of Scruggs.

## A. Daynard's Allegations

Daynard is a resident and citizen of the Commonwealth of Massachusetts. He is, and has been for over thirty years, a law professor at Northeastern University School of Law, located in Massachusetts. For much of that time, he has focused his professional and academic efforts on defeating the tobacco industry in court. Daynard is Chair of the Tobacco Product Liability Project, President of the Tobacco Control Resources Center, and a frequent advocate for, and consultant to, those opposing the tobacco industry.

For many years there was a consensus that the potential for recovery against the tobacco industry was negligible. Indeed, the tobacco industry, until 1997, boasted that it had never paid a cent to a tort plaintiff. As of 2002, the situation is drastically different. Lawyers have sued the tobacco companies on behalf of many states and recovered

astronomical sums for those states, with consequently large fees for themselves. During the past several years, almost every state has sued the tobacco industry, seeking, among other things, reimbursement for the medical costs incurred as a result of smoking-related health harms. The defendant law firms in this case have been responsible for instituting, litigating, and settling litigation against the tobacco industry on behalf of forty-six different states. This settlement was accomplished, in part, in what is known as the Master Settlement Agreement. <u>See</u> National Association of Attorneys General, Master Settlement Agreement, <u>at</u> http://www.naag.org/tobac/cigmsa.rtf (Nov. 23, 1998); <u>Greenless</u> v. <u>Almond</u>, 277 F.3d 601, 603 (1st Cir. 2002) (describing the tobacco litigation and settlement). Daynard says this settlement will result in a distribution of billions of dollars to the two firms.

Daynard says that his efforts were central to many of these titanic recoveries. He quotes reputable authorities stating that he is the "recognized leader" in tobacco litigation on behalf of the public health and the "foremost authority" on, and "driving force" behind, anti-tobacco legal theory and strategy. In fact, Daynard quotes one authority stating that without Daynard's tobacco work, the state-initiated tobacco litigation would not even exist.

The parties agree that Charles Patrick, then a partner at Ness Motley, came to Boston, Massachusetts in the fall of 1993 to meet with Daynard. Daynard says that, at the time Patrick traveled to Boston to retain his services, Ness Motley and Scruggs Millette were engaged in a tobacco litigation joint venture. Indeed, throughout his dealings with Ness Motley and Scruggs Millette, Daynard understood the two firms to be in a joint venture that at first encompassed the Mississippi tobacco litigation and then broadened to include tobacco litigation nationwide. Daynard insists that Patrick was acting on behalf of both firms and that Patrick retained him to advance the objectives of the firms' joint venture.

Shortly after this initial meeting in Boston, Daynard traveled to Ness Motley's South Carolina offices, where he met with members of the firm, including Ronald Motley. At these meetings, Daynard identified and explained legal theories for recovery on behalf of state governments. After these meetings, Daynard continued to communicate regularly, by phone and fax, with members of Ness Motley, providing them advice on similar matters.

As a result of Ness Motley's retention of him, purportedly on behalf of both firms, Daynard also began "communicat[ing] regularly" with the Mississippi law firm Scruggs Millette and providing the firm with "advice and assistance." Beginning in the fall of 1993, members of both firms came to Boston to meet with and receive advice from Daynard, in furtherance of his engagement by them.[1] According to his affidavit, Daynard "had many conversations, meetings and written communications in Boston with members of the defendant firms, in which [he] provided advice and undertook specific projects for their use in the tobacco litigation."

Daynard asserts that his legal theories, strategies, evidence, and arguments "subsequently formed a central component" of the firms' litigation brought on behalf of several states against the tobacco industry. In addition, Daynard introduced Ness Motley firm members to experienced tobacco litigators and to pleading and discovery files from other tobacco cases.

---

[1] Scruggs denies that he participated in any such meeting in Boston for these purposes.

Initially, Ness Motley compensated Daynard based on hourly fees for his services rendered. As Daynard's relationship with the two firms progressed, he had "several conversations" with "both Mr. Motley and Mr. Scruggs in which they stated that they would appropriately compensate [Daynard] . . . and that the final form of compensation would be" in the form of a share of the fees the firms obtained from handling the states' tobacco litigation. Ronald Motley advised Daynard that he would be compensated for his assistance as a member of the Ness Motley "team." After this communication, Daynard says that he received no further compensation from Ness Motley. As to payment by Scruggs Millette, the parties agree that Scruggs Millette never compensated Daynard.

When the state tobacco litigation commenced, Daynard continued to work with both firms, educating their attorneys on the relevant issues, counseling them based on his experience in other tobacco litigation, providing them with relevant documents and information, and introducing them to potential witnesses and contacts. He developed litigation strategies and worked on pleadings and other documents for the firms. Many of these services were performed in Boston. See Daynard v. Ness, Motley,

<u>Loadholt, Richardson & Poole, P.A.</u>, 188 F. Supp. 2d 115, 118 (2002) (stating that "Daynard performed his research and writing, met with Ness Motley partners, and allegedly formed a compensation contract in Massachusetts"); <u>id.</u> at 119. Daynard also spoke at conferences of state governmental officials where he arranged for Ness Motley and Scruggs Millette to participate, thereby advancing their ongoing litigation and providing them with legitimacy in the eyes of potential state clients.

Ness Motley recognized and encouraged Daynard's efforts by assigning him specific projects, by requesting his information and assistance, by transporting him to selected meetings and proceedings, and by accepting his work product. At some point in 1996, when Daynard became concerned that some Ness Motley attorneys were trying to minimize his role in the litigation, Mr. Motley assured Daynard that this was not the case.

In July of 1996, when Daynard reported to Ness Motley on the time he had expended to complete a research project that Ness Motley had requested, the firm, consistent with its own and the Scruggs defendants' past assurances, informed Daynard that it would compensate him for his work by paying him a share of

the fees generated if the litigation was successful, an arrangement to which Daynard agreed. As a result of this promise, Daynard ceased submitting descriptions of his hourly work and requests for payment to Ness Motley.

Daynard says that, at a meeting in late August of 1996, Scruggs Millette and Ness Motley "confirmed" their agreement to compensate him in the form of a share of the fees. On August 25 through August 27, 1996, Daynard, Motley, and Scruggs were in Chicago, Illinois, participating in meetings related to the state tobacco litigation. Scruggs and Motley scheduled a meeting with Daynard during that period to discuss Daynard's specific share of any fee award. Although Motley was ultimately not able to attend the meeting, Daynard met with Scruggs. Daynard says he asked Scruggs "whether he was speaking for both himself and Mr. Motley" and Scruggs stated that he was, that Daynard could rely on this, and that he was acting with at least "apparent authority" for Motley. Scruggs promised Daynard 5% of any fees ultimately recovered, in any state tobacco litigation in which any of the defendants were counsel, as compensation for Daynard's past and continuing assistance. Daynard says he accepted the 5% agreement and that he and Scruggs shook hands on

-12-

it. Based on the conduct of the Scruggs and Motley defendants during the course of the tobacco litigation, Daynard says that he reasonably believed Scruggs to be acting with apparent authority for both firms.

Relying on this 5% figure, and "ongoing assurances and representations," Daynard continued to work for the two firms. For example, Scruggs requested that Daynard be available during the trial in the Mississippi litigation and agreed to compensate Daynard for the cost of paying a substitute teacher to cover his Northeastern University teaching obligations. Daynard agreed by committing $15,000 of his own personal funds to buy himself out of his teaching obligations so that he could be present full-time during the trial.

Almost a year after the alleged handshake on the 5% compensation figure, and after the Mississippi state litigation had reached a tentative settlement, Daynard wrote a letter to Scruggs confirming the fee arrangement and identifying certain expenses that Daynard had incurred associated with the Mississippi litigation. Scruggs never responded. A few months later, Daynard wrote another letter, this time to both Scruggs and Motley, referring to the 5% fee arrangement. At this point,

both firms were expecting to reap significant attorney's fees from the Mississippi settlement and also from the Florida settlement. Joseph Rice of Ness Motley and Richard Scruggs both responded to this second letter and both disavowed the 5% fee arrangement. Neither firm has paid Daynard any of the legal fees it has received to date. Daynard alleges that the firms based their refusal to pay him the 5% on his failure to support certain national tobacco liability legislation, a requirement he says the defendants never mentioned in any previous communication.

## B. State Court Proceedings, Federal District Court Proceedings, and the Defendants' Side of the Story

On December 27, 2000, Daynard sued the Motley defendants and the Scruggs defendants in the Superior Court for Suffolk County, Massachusetts, seeking, among other things, compensation in the form of what Daynard says is his rightful share of fees generated from settlements with several states, not including Massachusetts. Daynard claims that Ness Motley and Scruggs Millette have already received millions and will receive over two billion dollars of the fees generated from the settlement, 5% of which he claims is rightfully his. With the

-14-

consent of the Motley defendants, the Scruggs defendants removed the case to federal district court on January 18, 2001.  See 28 U.S.C. § 1441 (1994).

In their answer, the Motley defendants conceded the Massachusetts court's personal jurisdiction, but told a story on the merits very different from Daynard's.  The Motley defendants admit that, in 1993, Patrick of Ness Motley met Daynard in Massachusetts, and that the firm continued to meet with and communicate with Daynard.  Furthermore, they agree that Daynard provided them with documents related to the tobacco litigation, identified some potential witnesses, and did some general work on the state tobacco litigation.  The Motley defendants admit that the firm made specific requests of Daynard and provided him with transportation to certain meetings and proceedings.  They say that they paid Daynard for this work.

But the Motley defendants downplay Daynard's expertise, say that his assistance was neither invaluable nor substantial, and claim that his theories never formed a central component of their tobacco litigation.  Furthermore, they deny that either they or Scruggs ever met with Daynard in Chicago and agreed upon the 5% figure.  They deny that any agreement as alleged by

-15-

Daynard existed. The Motley defendants' position is that they have already paid Daynard any money they ever owed him.

On May 30, 2001, the Motley defendants moved for summary judgment. The district court denied this motion in part on September 13, 2001, and issued its conclusions in a written memorandum on December 3, 2001. <u>Daynard</u> v. <u>Ness, Motley, Loadholt, Richardson & Poole, P.A.</u>, 178 F. Supp. 2d 9 (D. Mass. 2001). The district court addressed those issues reserved in the September 13 hearing and in the December 3 memorandum in a second memorandum and order, in which it denied the Motley defendants' motion for summary judgment. <u>Daynard</u>, 188 F. Supp. 2d 115.

The Scruggs defendants pursued a different legal strategy. On April 20, 2001, they moved to dismiss Daynard's complaint for lack of personal jurisdiction or for failure to state a claim, and moved in the alternative for summary judgement. <u>See</u> Fed. R. Civ. P. 12(b)(2), 12(b)(6), and 56. Scruggs stated that he never agreed to share any fees with Daynard and that

> [i]t has always been my understanding that Professor Daynard acted as a volunteer in all of his endeavors with respect to the litigation, or was otherwise

compensated by Ness Motley as a consultant on a limited basis, and that his activities were designed primarily to promote his own agenda with respect to tobacco control.

As to personal jurisdiction, Scruggs states that neither he nor his firm has ever had any offices, real estate, bank accounts, or other property in Massachusetts. Furthermore, none of the Scruggs defendants has ever practiced law in Massachusetts. Daynard does not deny this. In addition, Scruggs says that he has never traveled to Massachusetts in connection with any fee sharing arrangement with Daynard or in connection with any of Daynard's work under the alleged arrangement. He denies that he or his firm had any role in contacting or retaining Daynard in Massachusetts. He further states that the Scruggs defendants did not request, or even have knowledge of, the Motley defendants' meetings with Daynard. Scruggs also denies that the Scruggs defendants or the Mississippi joint venture, to the extent that it existed, ever gave the Motley defendants any directions with respect to Daynard.

Although Scruggs concedes that "Daynard did at times consult with me concerning the tobacco litigation in general," he says that "these instances were extremely infrequent and were

-17-

not requested or solicited by me" and that the "'assistance' . . . consisted of nothing more than information already made available to the general public."

With respect to any relationship between Scruggs Millette and Ness Motley, Scruggs stated, in a second affidavit, that Scruggs Millette was part of a written joint venture agreement in the Mississippi litigation, but that Ness Motley was not a party to that agreement. He says that "[p]rior to April of 1999, there was simply no arrangement [between Scruggs Millette and Ness Motley] with respect to the sharing of attorney's fees in the nationwide tobacco litigation." Scruggs also noted that there was no agreement that "either Scruggs Millette or Ness Motley could exert control over tobacco litigation in states where those firms were not counsel of record."

The district court, after one hearing on May 31, 2001, and after granting Daynard limited jurisdictional discovery on the issue of the relationship between the defendants from 1992 to 1998, held another hearing on September 13, 2001, in which it dismissed Daynard's complaint against the Scruggs defendants for lack of personal jurisdiction. At that September 13 hearing,

-18-

the district court stated what it labeled the "bottom line of [its] reasoning" for finding that it lacked personal jurisdiction over the Scruggs defendants:

> [W]hile the facts are sufficient to show a joint venture with respect to the Mississippi litigation, as the First Circuit has defined the term substantial influence in the Donatelli versus National Hockey League case, there is insufficient evidence in this case that the Mississippi law firm or Mr. Scruggs exercised a substantial influence over the Ness firm such as would subject Scruggs or the Mississippi firm to personal jurisdiction in Massachusetts.

Soon after that, the court entered final judgment in favor of the Scruggs defendants, thus permitting an immediate appeal to this court.

The district court supported its September 13 conclusion in a December 21, 2001, memorandum. Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 184 F. Supp. 2d 55 (D. Mass. 2001). In that memorandum, the district court addressed two theories on which Daynard might show personal jurisdiction over the Scruggs defendants. Id. at 60-76. First, the district court concluded that it did not have personal jurisdiction over the Scruggs defendants based on their own direct contacts with Massachusetts. Id. at 68. Second, the district court concluded that it lacked jurisdiction over the

-19-

Scruggs defendants based on contacts imputed from the Motley defendants.  Id. at 76.  The district court reasoned that the Scruggs defendants "likely were not in a joint venture" with the Motley defendants,[2] that the Motley defendants did not act as the Scruggs defendants' agent,[3] and that the "substantial influence" requirement articulated in Donatelli, 893 F.2d at 469, 472, precluded jurisdiction under the Due Process Clause, U.S. Const. amend. XIV.  Daynard, 184 F. Supp. 2d at 74-76.  Daynard appeals the district court's holding that it lacks personal jurisdiction under an imputed or attributed contacts theory.[4]

---

[2]     This conclusion is in some tension with the district court's earlier explanation, at the September 13 hearing, that "the facts are sufficient to show a joint venture with respect to the Mississippi litigation."

[3]     Earlier in its opinion, however, the district court noted that "the South Carolina defendants arguably acted as the Mississippi defendants' emissary," Daynard, 184 F. Supp. 2d at 66, an observation seemingly inconsistent with its conclusion that no agency relationship existed.

[4]     Daynard focuses on the district court's attributed contacts holding rather than on the district court's conclusion that the Scruggs defendants' direct contacts are insufficient. The Scruggs defendants emphasize this, noting that Daynard has not argued that their direct contacts alone are sufficient to permit personal jurisdiction.  We agree that Daynard does not advance this argument, but note that many of those facts, insufficient to establish jurisdiction based on the Scruggs defendants' direct contacts, are, of course, relevant to the imputed contacts analysis as well.  One cannot make a sensible

# II.

## A. Burden of Proof and Standard of Review

To hear a case, a court must have personal jurisdiction over the parties, "that is, the power to require the parties to obey its decrees."  United States v. Swiss Am. Bank, Ltd., 191 F.3d 30, 35 (1st Cir. 1999).  The plaintiff bears the burden of proving the court's personal jurisdiction over the defendant.  Foster-Miller, 46 F.3d at 145; Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 674-75 (1st Cir. 1992).  The district court, faced with a motion to dismiss for lack of personal jurisdiction, Fed. R. Civ. P. 12(b)(2), may choose from among several methods for determining whether the plaintiff has met this burden.  Foster-Miller, 46 F.3d at 145; Boit, 967 F.2d at 674-75.  "The most conventional of these methods," known as the "prima facie" method, Foster-Miller, 46 F.3d at 145, "permits the district court 'to consider only whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all

_____

inquiry into whether contacts imputed to the Scruggs defendants support personal jurisdiction without viewing those same contacts in the context of all of the other alleged facts of the case.

-21-

facts essential to personal jurisdiction,'" id. (quoting Boit, 967 F.2d at 675).[5]

The district court applied the prima facie method. Daynard, 184 F. Supp. 2d at 61. We review the district court's choice of method de novo. Foster-Miller, 46 F.3d at 147. The parties do not object to the district court's choice of the prima facie method. Daynard states in his brief that the district court employed the prima facie approach and the Scruggs defendants agree, making no attempt to challenge the applicability of this approach. Therefore, the Scruggs defendants have waived any objection to the application of the prima facie method. Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., No. 00-2341, 2002 U.S. App. LEXIS 5361, at *10 (1st Cir. Apr. 1, 2002); Ortiz v. Gaston County Dyeing Mach. Co., 277 F.3d 594, 598 (1st Cir. 2002). Under these circumstances, we accept the prima facie method.[6]

---

[5]    For a discussion of other potential methods of analysis, see Foster-Miller, 46 F.3d at 145-46 (describing "prima facie," "preponderance-of-the-evidence," and "likelihood" standards).

[6]    When "the assertion of jurisdiction is bound up with the claim on the merits," but there exists "the possibility of permitting a dubious case to proceed beyond the pleading stage, and even to trial, though the court eventually will be found to lack jurisdiction," we

-22-

Accordingly, Daynard has the burden of making a prima facie showing of personal jurisdiction over the Scruggs defendants. We "must accept the plaintiff's (properly documented) evidentiary proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing." Foster-Miller, 46 F.3d at 145. We take these facts "as true (whether or not disputed) and construe them in the light most congenial to the plaintiff's jurisdictional claim." Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998); see also Sawtelle v. Farrell, 70 F.3d 1381, 1385-86 (1st Cir. 1995). "We then add to the mix facts put forward by the defendants, to the extent that they are uncontradicted." Mass. Sch. of Law, 142 F.3d at 34. We review the district court's application of the prima facie standard de novo. Foster-Miller, 46 F.3d at 147.

**B. Background Law**

"In determining whether a non-resident defendant is subject to its jurisdiction, a federal court exercising diversity jurisdiction 'is the functional equivalent of a state

have noted that the "likelihood" standard may be appropriate. Foster-Miller, 46 F.3d at 146; see also Boit, 967 F.2d at 677-78.

-23-

court sitting in the forum state.'" Sawtelle, 70 F.3d at 1387 (quoting Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 204 (1st Cir. (1994)). "A district court may exercise authority over a defendant by virtue of either general or specific [personal] jurisdiction." Mass. Sch. of Law, 142 F.3d at 34. General jurisdiction exists when the defendant has engaged in "continuous and systematic activity" in the forum, even if the activity is unrelated to the suit. United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1088 (1st Cir. 1992). This is not such a case and no party suggests that it is. "In the absence of general jurisdiction, a court's power depends upon the existence of specific jurisdiction." Mass. Sch. of Law, 142 F.3d at 34.

To establish personal jurisdiction, Daynard must show that the Massachusetts long-arm statute grants jurisdiction and, if it does, that the exercise of jurisdiction under the statute is consistent with the constitution. Foster-Miller, 46 F.3d at 144.

Daynard's complaint pleads that personal jurisdiction exists under subsections (a), (c), and (d) of the Massachusetts

long-arm statute.  Mass. Gen. Laws ch. 223A, § 3 (2000).[7]  The relevant provision is § 3(a).  The question under this subsection is whether the Scruggs defendants "act[ed] directly or by an agent, as to a cause of action . . . arising from the [defendants'] . . . transacting any business in" Massachusetts.  Id. § 3(a).  We may sidestep the statutory inquiry and proceed directly to the constitutional analysis, however, because the Supreme Judicial Court of Massachusetts has interpreted the state's long-arm statute "as an assertion of jurisdiction over the person to the limits allowed by the Constitution of the

_____

[7]     The statute states, in relevant part:

A Court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's

(a)  transacting any business  in this commonwealth;
. . .

(c)  causing tortious injury by an act or omission in this commonwealth; [or]

(d)  causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue . . . , in this commonwealth . . . .

Mass. Gen. Laws ch. 223A, § 3(a), (c)-(d).

United States."  "Automatic" Sprinkler Corp. of Am. v. Seneca Foods Corp., 361 Mass. 441, 280 N.E.2d 423, 424 (1972); accord Tatro v. Manor Care, Inc., 416 Mass. 763, 625 N.E.2d 549, 553 (1994); see also Sawtelle, 70 F.3d at 1388 ("[W]hen a state's long-arm statute is coextensive with the outer limits of due process, the court's attention properly turns to the  . . . constitutional standards.").

"The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'"  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-72 (1985) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 319 (1945)).  "[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  Int'l Shoe, 326 U.S. at 316 (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)); see also Noonan v. Winston Co., 135 F.3d 85, 90 (1st Cir. 1998).  In a contract case, we evaluate the parties' "prior negotiations

-26-

and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" to determine whether the defendants purposefully established minimum contacts.  Burger King, 471 U.S. at 479.

The more difficult question in this case is whether any of the Motley defendants' contacts may be imputed to the Scruggs defendants for purposes of establishing "minimum contacts."  We conclude that some of these contacts may be imputed.  The next question is whether the sum of any imputed and direct contacts permits the court to exercise personal jurisdiction over the Scruggs defendants consistent with the Constitution.  We conclude that these contacts suffice under Supreme Court law, e.g., Burger King, 471 U.S. at 471-87; Int'l Shoe, 326 U.S. 310, and the law of this circuit, e.g., Noonan, 135 F.3d at 90; Foster-Miller, 46 F.3d at 144.

## C. Imputed Contacts

Daynard alleges that the relationship between the Motley defendants and the Scruggs defendants is such that some of the Motley defendants' contacts with Massachusetts should be imputed to the Scruggs defendants.  As the district court recognized, whether the defendants were in all respects joint

-27-

venturers is not alone dispositive, <u>Daynard</u>, 184 F. Supp. 2d at 74, although the parties focus much of their energies on disputing this particular issue. The basic question is whether the relationship between the Scruggs defendants and the Motley defendants, however one labels it, is sufficient to attribute any of the Motley defendants' contacts to the Scruggs defendants for the purpose of reaching the Scruggs defendants under the Massachusetts long-arm statute as cabined by the Due Process Clause of the Fourteenth Amendment. We conclude that the relationship was sufficient for that purpose. Daynard has put forth evidence that, if credited and accepted as true, is enough to support personal jurisdiction over the Scruggs defendants.

Daynard alleges that the Motley defendants and the Scruggs defendants were part of a formal, written joint venture between themselves. He also says that he believed the parties to be joint venturers because they "consistently purported to be" in such a relationship. Daynard argues that at the time Charles Patrick of Ness Motley came to Massachusetts to retain him, Ness Motley and Scruggs Millette were engaged in a form of tobacco litigation joint venture. Daynard says that Patrick was acting for both firms when Patrick retained him and that Patrick

-28-

retained him to advance the objectives of the joint venture. Throughout his dealings with Ness Motley and Scruggs Millette, he understood the two firms to be in a joint venture that at first encompassed the Mississippi tobacco litigation and then broadened to include tobacco litigation nationwide.

### 1. Applicability of <u>Donatelli</u>'s "substantial influence" test.

First, there is the threshold question of whether the district court properly applied <u>Donatelli</u>, 893 F.2d 459, as the governing test. The parties devote the majority of their attention to this issue, but it is not dispositive of the personal jurisdiction question. The district court concluded that even if the Motley defendants acted as the Scruggs defendants' agents, "there was no substantial influence as required by Due Process." <u>Daynard</u>, 184 F. Supp. 2d at 76. The district court derived this "substantial influence" requirement from <u>Donatelli</u>, 893 F.2d at 469, a general jurisdiction case. The district court was in error. It read <u>Donatelli</u> as applying an exclusive test and as applying in the present, very different context. This over-reads <u>Donatelli</u>.

The question before us is whether Daynard must meet the

substantial influence test in order to comply with jurisdictional Due Process requirements. Although <u>Donatelli</u> aids our inquiry, we conclude that its substantial influence test is not the exclusive test for attribution of conduct. It does not control the matter before us here, where the questions are whether the Scruggs defendants were in an actual or apparent agency relationship, or at least held themselves out to be in a joint venture or other agency relationship with the Motley defendants, and whether the Scruggs defendants ratified the Motley defendants' conduct.

In <u>Donatelli</u>, this court held that

> an unincorporated association which does not itself conduct significant activities in, or enjoy affiliating circumstances with, a state cannot be subject to the general personal jurisdiction of the state's courts on the basis of a member's contacts within the state unless the member carries on the in-forum activities under the association's substantial influence.

<u>Id.</u> at 472. Donatelli sued the National Hockey League ("NHL") in Rhode Island, challenging the NHL's draft and its failure to declare him a free agent. Jurisdiction in Rhode Island over the NHL was premised on the fact that a member team of the NHL had contacts with Rhode Island. His suit was unrelated to either

the NHL's contacts with Rhode Island or its member's contacts with Rhode Island. Id. at 462. The Donatelli court rejected the theory that the NHL could be subject to general personal jurisdiction in Rhode Island simply because one of its members was subject to general jurisdiction in that state. Id. at 472. It concluded that, in these circumstances, a showing of "substantial influence" was necessary in order to attribute one's contacts to the other consistent with the requirement of purposeful availment. Id. at 469.

Donatelli's substantial influence test does not control the entire universe of cases in which one party's contacts might be attributed to another. By its terms, Donatelli applies "in the world of unincorporated associations." Id. at 468. Indeed, as Donatelli itself observed, the substantial influence test does not control where one seeks to attribute contacts from partner to partnership or from subsidiary to corporate parent. Id. at 465-67. In the partnership context, "the activities of the partner are generally attributed to the partnership and jurisdiction over the partnership follows from the partner's contacts, if sufficient, regardless of the absence of independent contacts between the partnership qua entity and the

-31-

forum." Id. at 466. Donatelli's substantial influence test does not apply here, where the question is whether an actual or implied agency relationship, sufficient to attribute contacts, existed between the parties. We conclude that, similar to some cases involving actual partnerships, the relationship between the defendants here invokes certain principles of the law of agency, partnership, and joint venture and that these principles permit imputing contacts without the need to show substantial influence.

In addition, although we do not decide whether Donatelli's approach to attribution is necessarily limited to general jurisdiction cases, we note, as stated several times in the Donatelli opinion, including in the above quoted passage, that Donatelli "focus[ed] . . . upon . . . general as opposed to specific jurisdiction." Id. at 463; see also id. at 461 (stating the issue on appeal as whether "an unincorporated association is subject to the general personal jurisdiction of every court having jurisdiction over one of its members") (internal quotation marks omitted). This is important because, as Donatelli states clearly, the standard for general jurisdiction is more strict than the standard for specific jurisdiction. Id. at 463. General jurisdiction

requires that the defendant's activities in the forum be "continuous and systematic," United Elec., Radio & Mach. Workers, 960 F.2d at 1088, whereas specific jurisdiction requires a lesser showing.

The problem Donatelli addresses is, in some ways, more likely to occur in general jurisdiction cases. In general jurisdiction cases, the suit does not arise out of or relate to the defendant's forum contacts. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n.9 (1984). Donatelli addresses the potentially unjust scenario in which an association, with no direct contacts with a forum, is haled into a forum based on one of its members' continuous and systematic activities in the forum, to answer a lawsuit unrelated to either the member's or the association's in-forum activities. 893 F.2d at 469. Something more is needed to say that the association has purposefully availed itself of the benefits of in-forum activity. Otherwise, the association is subject to a suit in that forum, unrelated to anything the association has done in the forum, by merely engaging in a limited relationship with a member, that through its own activities engages in continuous and systematic activities in a forum.

Donatelli resolves this problem by holding that, in general jurisdiction cases, the association must "exercise[ ] substantial influence over the member's decision to carry on the in-forum activities which constitute the relevant 'minimum contacts.'" Id. This requirement ensures that the association purposefully availed itself of the benefits of the forum, because it links the member's in-forum activity with the association's relationship with that member.

This problem, however, is less likely to arise in specific jurisdiction cases such as this one. Here a direct connection is alleged between the in-forum activities of the agent (the Motley defendants) and the agent's relationship with the principal (the Scruggs defendants). When the cause of action relates to both the association's activities giving rise to the suit and to the member's in-forum activities, the same risk of unfairness is not necessarily present. In the present case, Daynard's suit relates to the Scruggs defendants' alleged promise to pay him a share of the fees and to the Motley defendants' activities in Massachusetts, claimed to have been ratified by Scruggs. Donatelli is not controlling in this context. It addresses a question different from the inquiry

-34-

here, which is whether there was an agency relationship between the defendants and whether the Scruggs defendants ratified the Motley defendants' activities in Massachusetts giving rise to Daynard's suit.

But that does not end the matter. We must still determine whether the relationship between the defendants permits imputing a sufficient quantum of the Motley defendants' connections to the Scruggs defendants.

**2. Implied agency and ratification.**

For purposes of personal jurisdiction, the actions of an agent may be attributed to the principal.[8] Whether or not an agent is initially authorized to act on behalf of a principal, the agent's actions may be attributed to the principal, for

_____

[8] See Burger King, 471 U.S. at 480 n.22 (stating that commercial activities carried out on a party's behalf "may sometimes be ascribed to the party," but declining to "resolve the permissible bounds of such attribution"); Grand Entm't Group, Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 483 (3d Cir. 1993) (stating that "[a]ctivities of a party's agent may count toward the minimum contacts necessary to support jurisdiction"); Sher v. Johnson, 911 F.2d 1357, 1362 (9th Cir. 1990) (stating that the actions of an agent are attributed to the principal for personal jurisdiction purposes); see also Donatelli, 893 F.2d at 466 (noting the general rule that "jurisdiction over a partner confers jurisdiction over the partnership"); Lewis v. Fresne, 252 F.3d 352, 359 (5th Cir. 2001) (same).

purposes of personal jurisdiction, if the principal later ratifies the agent's conduct. Myers v. Bennett Law Offices, 238 F.3d 1068, 1073 (9th Cir. 2001); Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc., 65 F.3d 1427, 1433 (8th Cir. 1995) (attributing contacts where principal "supported, accepted, and followed through on the efforts initiated" by the agent, regardless of whether the agent had authority to act on the principal's behalf). First, we address whether the defendants were in any sort of agency relationship. Second, we discuss whether the Scruggs defendants initially authorized, or later ratified, the Motley defendants' actions.

We disagree with the district court's conclusion that "the defendants were not in any sort of agency relationship." Daynard, 184 F. Supp. 2d at 74; see also id. at 76. Traditional common law concepts support the conclusion that the Scruggs defendants' relationship with the Motley defendants suffices to bring the parties within the rule that permits imputation of contacts for jurisdictional purposes.

Section 16 of the Uniform Partnership Act, which is codified in the laws of Massachusetts, Mississippi, and South Carolina, recognizes the common law doctrine of partnership by estoppel --

or, in this case, joint venture by estoppel. Unif. P'ship Act § 16(1), 6 U.L.A. 125, 501 (1995); Mass. Gen. Laws ch. 108A, § 16 (2000); Miss. Code Ann. § 79-12-31 (2001); S.C. Code Ann. § 33-41-380 (2001). The Uniform Partnership Act states:

> When a person . . . represents himself, or consents to another representing him to any one, as a partner . . . he is liable to any such person to whom such representation has been made, who has, on the faith of such representation, given credit to the actual or apparent partnership, and if he has made such representation or consented to its being made in a public manner he is liable to such person, whether the representation has or has not been made or communicated to such person so giving credit by or with the knowledge of the apparent partner making the representation or consenting to its being made.

Unif. P'ship Act, supra, § 16(1); see also Standard Oil Co. v. Henderson, 265 Mass. 322, 163 N.E. 743, 745 (1928) (stating the common law doctrine of partnership by estoppel).

Partnerships and joint ventures aside, a theory of agency by estoppel is similarly availing to Daynard. Under the Restatement (Second) of Agency,

> [a] person who is not otherwise liable as a party to a transaction purported to be done on his account, is nevertheless subject to liability to persons who have changed their positions because of their belief that the transaction was entered into by or for him, if
>
> (a)   he intentionally or carelessly caused such belief, or
>
> (b)   knowing of such belief and that others might

-37-

> change their positions because of it, he did
> not take reasonable steps to notify them of the
> facts.

Restatement (Second) of Agency § 8B (1958); accord H.G.
Reuschlein & W.A. Gregory, The Law of Agency and Partnership §
25, at 65-66 (2d ed. 1990) (noting that "[c]onduct which leads
a third party to believe that the agent has authority and thus
creates apparent authority to those persons who act upon it,
frequently causes the principal to be liable to those who have
changed their position in reliance to their detriment"); L.
Lakin & M. Schiff, The Law of Agency 38 (1984) (stating an
"equitable principle of agency by estoppel" similar to that of
the Restatement (Second)).

Even if the defendants' relationship were to fall
slightly outside of the confines of these specific doctrines,
the question before us is whether a sufficient relationship
exists under the Due Process Clause to permit the exercise of
jurisdiction, not whether a partnership, joint venture, or other
particular agency relationship between the two defendants
exists. We think it consistent with the Due Process Clause to
attribute to the Scruggs defendants the Motley defendants'
retention of, and certain interactions with, Daynard where, as

Daynard alleges, they have led Daynard and the public to believe they were joint venturers. That is a different issue from whether, in a dispute between the two firms, a joint venture agreement could be enforced.

We take the facts alleged and produced by Daynard in the light most favorable to his jurisdictional assertion. Even if the parties were not joint venturers, they held themselves out to Daynard to be part of a joint venture or other agency relationship and are subject, for personal jurisdiction purposes, to the doctrine of estoppel. Daynard, throughout his dealings with the defendants, understood them to be joint venturers. He says the parties "consistently purported to be joint venturers" and that he reasonably relied on this understanding. The question is whether he had a basis for this belief grounded in the Scruggs defendants' own conduct or conduct undertaken with their consent.

In support of his understanding, Daynard states that he believed the firms to be in a joint venture based on their statements and conduct. Daynard states that Patrick was acting for both firms when Patrick retained him and that Patrick retained him to advance the objectives of the joint venture. He

says that during this first meeting, Patrick described the tobacco litigation as stemming from a meeting between Scruggs and the Mississippi attorney general, which then resulted in Scruggs "br[inging] the Motley firm into their plans."

Daynard supports his claim with documentary evidence of a joint venture that he unearthed through jurisdictional discovery. Around October 1994, the Scruggs defendants entered into a "Joint Venture Agreement" with several firms to pursue tobacco litigation on behalf of the state of Mississippi. The Motley defendants claim to have abided by this agreement and their firm's name was listed on the agreement, although they never signed the agreement. In a letter from Joseph Rice of Ness Motley to Richard Scruggs, Rice stated: "As we have discussed several times, we have not signed the Mississippi Joint Venture Agreement solely because we don't want to be governed by Mississippi Tax Law. We are agreeable to all terms in the agreement and, as you know, we have acted under the agreement from the beginning." In the agreement, Ness Motley firm members, including Mr. Motley, were listed as members of several of the "teams" and "committees" forming the "Litigation Management Structure" outlined in the agreement. Mr. Motley was

a co-chairman of the "Public Relations Team," which also included Steve Bozeman from Scruggs Millette. Indeed, Ness Motley was counsel of record in the Mississippi case. In addition, Daynard notes that "the two defendant firms were parties to a 'Resolution' which recited that they had both 'made and entered into that certain Joint Venture Agreement' concerning the Mississippi litigation."

Scruggs says that Ness Motley did not sign the joint venture agreement, that Ness Motley did not perform under the agreement's terms, and that the litigation team did not function as outlined in the agreement. He says Ness Motley did not make the capital contributions specified in the agreement, that there was a distinction between being counsel of record and being a party to the joint venture agreement, and that Ness Motley's failure to sign the agreement caused "great concern." Scruggs says that, upon receiving the letter from Rice, stating that Ness Motley had "acted under the agreement from the beginning," he called Rice and told him that "this wasn't good enough" and that "nobody else" considered Ness Motley to have performed under the agreement.

Scruggs concedes, however, that the profits from the

Mississippi litigation, outlined in this agreement, were eventually divided with Ness Motley, but he says that the division was under the terms of a 1999 agreement. Scruggs states that his "understanding with Ness Motley was always that at the end of the day, we would attempt to negotiate a fee and expense sharing arrangement, each trusting the goodwill of the other to reach a successful negotiation, but without any guarantee that we would." In addition, Scruggs admits that "[t]here was a general cooperative effort between [Scruggs Millette and Ness Motley] to advance litigation against the tobacco industry."

Daynard then says that after Motley hired him, he began a course of dealing with the defendants in which he provided both firms with legal advice, including advice to members of the Scruggs firm physically present in Boston, as well as assistance provided from Boston by phone and fax. Daynard also cites several conversations with both Scruggs and Motley in which they agreed to pay him a share of the fees obtained by both firms, Scruggs's statement that Scruggs had at least apparent authority to promise the 5%, and Motley's statement that he would be compensated as part of the "team."

-42-

Daynard cites a popular book about the tobacco litigation, which he says describes Ness Motley and Scruggs Millette as joint venturers beginning in 1993, as evidence that the firms were engaged in a well publicized joint venture or at least held themselves out to be so engaged. <u>See</u> M. Orey, <u>Assuming the Risk: The Mavericks, the Lawyers, and the Whistle-Blowers Who Beat Big Tobacco</u> 265 (1999) (stating that Scruggs, Motley, and two others, were the "nucleus" of a tobacco litigation "team," which "drafted a joint-venture agreement that spelled out in elaborate detail the duties each of the lawyers would perform"). He notes, as additional evidence of public perception, that in the Texas tobacco litigation, other lawyers sent the firms checks made payable to "Ness Motley/Scruggs." At least four such checks appear in the record.

Finally, in support of his claim that the defendants held themselves out to be joint venturers, Daynard presents a 1998 letter to Hawaii's attorney general, from Joseph Rice of Ness Motley, stating that "Ness, Motley has an arrangement with Richard Scruggs to work jointly on all of the state cases against the Tobacco Industry." Noting that "[w]e have no formal, written agreement," he said "Ness, Motley and Dick

-43-

Scruggs have been doing business together for almost ten years and have never had any differences. We fully anticipate sitting down in hindsight and determining what the division of any recoveries would be between the two law firms."

Scruggs said that he considered Rice's statement that "Ness, Motley has an arrangement with Richard Scruggs to work jointly on all of the state cases against the Tobacco Industry" to be "a bit of an overstatement." On the other hand, Rice's letter to Hawaii's attorney general said "I am sending a copy of this letter to Dick so he may respond likewise, if he has any questions or any additions." Scruggs did not write anything to contradict Rice's characterization and stated, in his deposition, that "[t]here was no reason to contradict it." Scruggs conceded that "[t]here was a general cooperative effort between [Scruggs Millette and Ness Motley] to advance litigation against the tobacco industry." Although this letter may not go to Daynard's understanding of the firms' relationship, and although it was written by Rice of Ness Motley, not by any of the Scruggs defendants, Scruggs's silence carries at least some weight.

-44-

The facts as alleged by Daynard are sufficient to make the jurisdictional showing that, in Boston, Patrick of Ness Motley hired Daynard, that Daynard reasonably understood Patrick to be acting on behalf of a joint venture or other agency relationship between Ness Motley and Scruggs Millette, and that Daynard relied on this understanding by providing his services to both defendants.

Many of these same facts support the conclusion that the Scruggs defendants subsequently ratified the Motley defendants' conduct. Even if Patrick, when he hired Daynard, was acting without actual authority from the Scruggs defendants, Daynard says Patrick purported to act as an agent for both firms when Patrick retained Daynard, and that Scruggs effectively ratified that representation.

"A person may ratify a prior act done by another without actual or apparent authority. . . . by . . . conduct that is justifiable only on the assumption that the person so consents." Restatement (Third) of Agency § 4.01 (Tentative Draft No. 2, 2001).[9]

_____

[9] As described in the Restatement (Second), "Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." Restatement (Second) of

-45-

"The sole requirement for ratification is a manifestation of assent or other conduct indicative of consent by the principal." Restatement (Third) of Agency, supra, § 4.01, cmt. b; see also Inn Foods, Inc. v. Equitable Coop. Bank, 45 F.3d 594, 597 (1st Cir. 1995) (stating that "[u]nder Massachusetts law, ratification of an agent's acts may be express or implied"). The Scruggs defendants, on the facts alleged, engaged in such conduct.

After Ness Motley retained Daynard, and as a result of this employment, Daynard asserts that he began providing information directly to the Scruggs defendants. Daynard says that he "communicated regularly" with the Scruggs defendants, that they came to Boston to receive his advice, and that he "had many conversations, meetings and written communications in Boston with members of the defendant firms, in which [he] provided advice and undertook specific projects for their use in the tobacco litigation." Even if the Scruggs defendants did not come to Boston, we think there is adequate other evidence of ratification, accepting Daynard's allegations.

Daynard says that he had "several conversations" with "both Mr. Motley and Mr. Scruggs in which they stated that they

---

Agency, supra, § 82.

-46-

would appropriately compensate [Daynard] . . . and that the final form of compensation would be" in the form of a share of the fees the firms obtained from handling the state tobacco litigation. Daynard says Ronald Motley advised him that he would be compensated for his assistance as a member of the Ness Motley "team." Further evidence of ratification comes from Daynard's version of the Chicago meeting, where Scruggs said he acted with at least apparent authority for both firms and reached an agreement. Daynard says that Scruggs shook hands on a deal to pay him 5% of these fees. These assurances and reassurances that Daynard would be paid a portion of the recovered fees were an integral part of the ongoing relationship existing between Daynard, the Motley defendants, and the Scruggs defendants.

Finally, Daynard asserts that in reliance on his arrangements with the Scruggs defendants and at their request, he had to commit out-of-pocket expenses of $15,000 to retain someone to meet his teaching obligations. Again, there is no evidence that Scruggs disavowed any contractual relationship as he accepted Daynard's assistance. To be sure, Scruggs says Daynard was a volunteer, but reasonable inferences support Daynard's version.

The Scruggs defendants had many opportunities to disavow a relationship with Daynard or to clarify the relationship. For example,

-47-

they could have rejected his assistance or accepted it only on certain conditions.  Instead, according to Daynard, they repeatedly encouraged and accepted his assistance and during several conversations agreed to pay him in the form of a share of the fees generated.  When Daynard wrote his first letter to Scruggs in July 1997 confirming the fee arrangement, Scruggs remained silent.[10]

By knowingly accepting the benefits of the transaction initiated in Massachusetts, the Scruggs defendants ratified Patrick's act of hiring and retaining Daynard on behalf of both firms, which ultimately gave rise to this law suit.  See Inn Foods, 45 F.3d at 597 n.7 (noting that "benefits received are certainly strong evidence that the principal acquiesced in the agent's transaction"); Restatement (Third) of Agency, supra, § 4.01, cmt. d.  In addition, by repeatedly agreeing to compensate Daynard for ongoing work conducted in Massachusetts, agreeing to pay Daynard a share of the fees and later shaking hands on the 5% figure, and accepting his coming from Boston to Mississippi to assist at trial, Scruggs, acting on behalf of his firm

---

[10]     It was not until November 1997, after Daynard had provided years of services and the firms were expecting to reap significant financial rewards from at least the Mississippi and Florida litigation, that Scruggs responded to Daynard's second letter, after he ignored the first letter, and disavowed the 5% fee arrangement. Daynard asserts that, even at this point, Scruggs disputed only the extent of Daynard's compliance with the agreement, not the existence of the agreement.

-48-

and, according to Daynard, the Ness Motley firm as well, ratified the arrangement in which the Motley defendants agreed to pay Daynard for his ongoing services as a member of the team.

## D. The Remaining Constitutional Analysis

The easier question in the case is the remaining constitutional one. Given the Scruggs defendants' direct contacts with Massachusetts and their contacts imputed from the Motley defendants, do the Scruggs defendants have "minimum contacts" with Massachusetts "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"? Int'l Shoe, 326 U.S. at 316 (quoting Milliken, 311 U.S. at 463). The answer is yes.

For specific jurisdiction, this circuit divides the constitutional analysis into three categories: relatedness, purposeful availment, and reasonableness:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

Foster-Miller, 46 F.3d at 144; see also Noonan, 135 F.3d at 90.

The Supreme Court, speaking on the subject of specific personal

jurisdiction in contract cases, has "emphasized that parties who

'reach out beyond one state and create continuing relationships

and obligations with citizens of another state' are subject to

regulation and sanctions in the other State for the consequences

of their activities."  Burger King, 471 U.S. at 473 (quoting

Travelers Health Ass'n v. Virginia, 339 U.S. 643, 647 (1950)).


### 1. Relatedness.

As to the first requirement, that "the claim underlying

the litigation must directly arise out of, or relate to, the

defendant's forum-state activities," Foster-Miller, 46 F.3d at

144, the district court correctly concluded, based merely on the

Scruggs defendants' direct contacts with the forum, that the

alleged

> breach of contract in this case "arose" from a course
> of dealing between the parties.  The contract was in
> the form of a working relationship -- started in
> Massachusetts -- that called for interaction between
> Massachusetts, South Carolina, and Mississippi.
> Drawing all inferences in favor of Daynard, he
> arguably meets the relatedness requirement,

Daynard, 184 F. Supp. 2d at 66.  It is clear that  Daynard's breach of contract claim "arise[s] out of, or relate[s] to," the Scruggs defendants' Massachusetts activities.  Foster-Miller, 46 F.3d at 144.  Daynard's lawsuit is based on his claim that the defendants owe him money for his work pursuant to an agreement initiated by the defendants while physically present in Massachusetts and performed, in part, in Massachusetts.  This relationship contemplated ongoing interaction between Daynard, in Massachusetts, and the defendants, in Mississippi and South Carolina.  Daynard's suit arises out of these Massachusetts activities, which were instrumental to the formation of the disputed oral contract.  See McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957) (upholding jurisdiction over a suit "based on a contract which had substantial connection with th[e] State"); Hahn v. Vt. Law Sch., 698 F.2d 48, 51-52 (1st Cir. 1983).

### 2. Purposeful availment.

"Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's

involuntary presence before the state's courts foreseeable." Foster-Miller, 46 F.3d at 144. "The cornerstones upon which the concept of purposeful availment rest[s] are voluntariness and foreseeability." Sawtelle, 70 F.3d at 1391 (citing Ticketmaster, 26 F.3d at 207).

The district court's reasoning on purposeful availment considered only the Scruggs defendants' direct contacts and found them insufficient. We need not address this conclusion as Daynard has not challenged it on appeal. We note, however, that, as the district court recognized, Scruggs did have some contacts with Massachusetts, however minimal. The Scruggs defendants, according to Daynard, engaged in telephone and fax communications with him in Massachusetts.[11] In addition, Daynard says the Scruggs defendants also had conversations with him, in which they agreed to pay him a share of the fees as compensation

---

[11] "The transmission of facts or information into Massachusetts via telephone or mail would of course constitute evidence of a jurisdictional contact directed into the forum state." Mass Sch. of Law, 142 F.3d at 36; see also Burger King, 471 U.S. at 476 (stating that "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines" and that defendants may not defeat jurisdiction merely by showing that they never physically entered the forum).

for work performed in Massachusetts.  He also says that Scruggs firm members came to Boston to receive his advice, although Scruggs denies this.

Combined with Patrick's physical presence in Massachusetts to negotiate the agreement which ultimately gave rise to this litigation, and the ongoing relationship between the Motley defendants and Daynard -- properly attributed to the Scruggs defendants -- we can properly say that the Scruggs defendants "engaged in . . . purposeful activity related to the forum that would make the exercise of jurisdiction fair, just, or reasonable," Rush v. Savchuk, 444 U.S. 320, 329 (1980).  See Burger King, 471 U.S. at 479 (holding that "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" must be evaluated to determine whether the defendant purposefully established minimum contacts).  Patrick's action alone is probably sufficient to support jurisdiction over the Motley defendants and, when imputed, the Scruggs defendants as well. See id. at 475 n.18 (noting that "[s]o long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction") (quoting McGee, 355 U.S. at 223); R.C.

-53-

Casad & W.B. Richman, 1 <u>Jurisdiction in Civil Actions: Territorial Basis and Process Limitations on Jurisdiction of State and Federal Courts</u> § 4-2, at 413 (3d ed. 1998) (stating that "if the defendant or its agent was physically present in the state to negotiate the service contract, cases have found that the defendant transacted business there"). Even in cases where the defendant was not physically present in the forum, where the defendant initiated the transaction by mailing or calling the plaintiff in the forum and when the defendant contemplated that the plaintiff would render services in the forum, all as alleged by Daynard here, many courts have found jurisdiction. Casad & Richman, <u>supra</u>, § 4-2, at 414.

### 3. Reasonableness.

"Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable." <u>Foster-Miller</u>, 46 F.3d at 144; <u>see also</u> <u>World-Wide Volkswagen Corp.</u> v. <u>Woodson</u>, 444 U.S. 286, 292 (1980) (listing factors). The Gestalt factors support the conclusion that jurisdiction is reasonable.

The burden on the Scruggs defendants of appearing in Massachusetts, given that they routinely represent clients outside their home state, is not by any means unusual. In

-54-

addition, Daynard's interest in bringing his action in this forum, given the traditional deference accorded to a plaintiff's choice of forum, weighs in favor of personal jurisdiction. This is particularly true in light of Massachusetts's stake in being able "to provide a convenient forum for its residents to redress injuries inflicted by out-of-forum actors." Sawtelle, 70 F.3d at 1395. Massachusetts's adjudicatory interest is likely to weigh in favor of exercising personal jurisdiction because the district court has already decided that, as between Daynard and the Motley defendants, Massachusetts law governs the dispute over the oral fee-splitting arrangement. Daynard, 188 F. Supp. 2d at 118-23. Finally, efficient administration of justice favors jurisdiction in Massachusetts, where this action is already proceeding against the Motley defendants.

## E. Conclusion

We conclude that the Scruggs defendants' contacts properly imputed from the Motley defendants, against the backdrop of the Scruggs defendants' direct contacts with Massachusetts, constitute "minimum contacts" with Massachusetts "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"

Int'l Shoe, 326 U.S. at 316 (quoting Milliken, 311 U.S. at 463).
Again, we emphasize that we reach this conclusion under the
prima facie approach, taking Daynard's properly documented
evidentiary proffers "as true (whether or not disputed) and
constru[ing] them in the light most congenial to [Daynard's]
jurisdictional claim."   Mass. Sch. of Law, 142 F.3d at 34.
Nothing in the opinion precludes the Scruggs defendants, in the
prospective district court proceedings, from challenging these
facts, if they wish, and renewing their jurisdictional
challenge, if appropriate.

### III.

For these reasons, we reverse the dismissal of the
Scruggs defendants for lack of personal jurisdiction and remand
to the district court for further proceedings consistent with
this opinion.