# United States Court of Appeals

## For the First Circuit

_____

No. 01-2481

JET WINE & SPIRITS, INC.,

Plaintiff, Appellant,

v.

BACARDI & COMPANY LTD.,

Defendant, Appellee,

BACARDI LTD., BACARDI U.S.A., INC.,

Defendants.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. James R. Muirhead, U.S. Magistrate Judge]

_____

Before

Boudin, Chief Judge,

Lynch and Lipez, Circuit Judges.

_____

Evan T. Lawson with whom J. Mark Dickison and Lawson & Weitzen, LLP were on brief for appellant.

Gerald J. Caruso with whom Carlene A. Pennell, Nur-ul-Haq, and Rubin and Rudman, LLP were on brief for appellee.

_____

July 18, 2002

_____

**LYNCH**, <u>**Circuit Judge**</u>. This case raises the issue of the exercise of personal jurisdiction by a federal district court over an international corporation that has been allocated certain responsibilities within a complex corporate family. Jet Wine & Spirits, a broker of alcoholic beverages in New Hampshire, appeals the dismissal, for lack of personal jurisdiction, of its action based on state contract and tort law against Bacardi & Company (BACO), an owner of various trademarks and intellectual property related to internationally sold alcoholic beverages.

BACO owns several brands of Dewar's Scotch and Bombay Gin, which it acquired from Diageo, which had a relationship with Jet Wine. Jet Wine had previously distributed Dewar's in several New England states, including New Hampshire, and Bombay in Maine. As distributor, Jet Wine had been party to a contract with subsidiaries of the companies that merged to form Diageo. After BACO's acquisition of the brands, a corporate cousin of BACO terminated Jet Wine as distributor. Jet Wine then sued a number of members of the Bacardi corporate family on several theories. In this appeal, only its claims against BACO are at issue. Jet Wine says that BACO assumed Diageo's contractual obligations to Jet Wine and then reached into New Hampshire (among other states) to violate the contract terms and disrupt Jet Wine's various protected interests. BACO says it has nothing to do with New Hampshire, and, for that matter, nothing to do with Jet Wine's contract. We conclude that whatever the ultimate merits of Jet Wine's

substantive claims, there is enough of a prima facie showing to support the exercise of personal jurisdiction, and reverse.

I.

We first describe the facts as we take them for the purpose of this appeal. As we discuss in more detail in Part III, the facts of the case are at present merely Jet Wine's allegations so far as evidence supports them after preliminary jurisdictional discovery, supplemented by BACO's uncontested allegations.

Jet Wine is a New Hampshire corporation that does business in New Hampshire and is owned by the Martignetti Corporation, itself a Massachusetts corporation. New Hampshire directly controls all sales of alcohol in the state through its State Liquor Commission, and Jet Wine is licensed to sell to the Commission. In 1996 and 1997, Jet Wine signed several contracts with Schieffelin & Somerset Co. by which it became Schieffelin's exclusive distributor in New Hampshire, Vermont, and Maine for various alcoholic beverages, including the White Label and Ancestor brands of Dewar's Scotch. The arrangements were to last until the end of 1999, and after that could be terminated by either party on thirty days' notice. Each contained a clause stating that "[t]he parties hereby consent and submit to the personal jurisdiction of the United States District Courts within the State of New York." Jet Wine also alleges an agreement with Carillon Importers, by which it became Carillon's representative in Maine for Bombay Gin for an indefinite period.

BACO is a Liechtenstein corporation with its primary place of business in the Bahamas. It is wholly owned by Bacardi International Limited (BIL). BIL is in turn almost wholly owned (99.88%) by Bacardi Limited (BL), a Bermuda corporation with its primary place of business in Bermuda. BL also wholly owns Bacardi U.S.A. (BUSA),[1] a Delaware corporation with its primary place of business in Florida. BL serves as a holding company for the various other Bacardi corporations. BACO owns various trademarks and other intellectual property related to the sale of alcoholic beverages. BUSA imports alcoholic beverages into, and distributes them in, the United States. There is some overlap of officers and directors among the corporations: BACO's President is among BL's directors, the Chairman of BIL's Board of Directors is a Senior Vice President of BL, one of BACO's Vice Presidents is also a Vice President of BL, and the Chairman of BUSA's Board was among BL's alternate directors when the complaint was filed.

BACO does no business directly in New Hampshire, except possibly through its web site, as described below. The parties dispute whether BACO does business there through an agent, as discussed in Part III of this opinion. BACO owns an internet domain name, bacardi.com, that corresponds to a site on the World Wide Web at http://www.bacardi.com. It also owns clubbacardi.com, for which no Web site presently exists. From November 1998 to September 1999, http://www.bacardi.com sold some Bacardi

---

[1] At the time of the district court's decision in this case, BUSA was named Bacardi-Martini U.S.A. It has since changed its name.

promotional items (clothing and keychains, not alcohol), including two sales to New Hampshire addresses for a total of $30.75. This money went to National Corporate Services Unlimited, an unrelated company that buys merchandise from BUSA and sells it over the Web site. BACO also owns dewars.com, dewarsscotch.com, and bombaysapphire.com, each of which corresponds to a Web site. Jet Wine has shown no sales from those Web sites in New Hampshire. BACO owns one trademark, "Havana Club," that is registered in New Hampshire.

Schieffelin, Jet Wine's former source for Dewar's, was a subsidiary of Guinness. Carrillon, Jet Wine's former source for Bombay, was a subsidiary of Grand Metropolitan. In 1997, Guinness and Grand Metropolitan began negotiating a merger that eventually produced Diageo. The merger encountered opposition from the Federal Trade Commission, which demanded that Diageo sell some of its operations to preserve competition that the merger would otherwise eliminate. Among those operations were Dewar's and Bombay. On March 27, 1998, BL's CEO, acting for BACO and for William Lawson Distillers (another subsidiary of BL), signed two Asset Purchase Agreements with Diageo for assets related to the Dewar's and Bombay brands. BACO agreed "[o]n the terms and subject to the conditions set forth [in the Agreements] . . . to assume and discharge or perform when due all Assumed Liabilities." "Assumed Liabilities" as defined in the Dewar's Agreement include

> all liabilities and obligations that arise out of or relate to the Transferred Assets (including under any Contract) [or] the Dewar's Business . . . to the extent attributable to occurrences and circumstances arising on

-5-

or following the Closing, including any obligations to deliver finished case goods following the Closing under purchase orders of, or commitments to, Persons other than Affiliates of Seller.

"Contract" is defined by reference to a schedule attached to the Agreement, which does not mention Jet Wine or New Hampshire, and in addition to include "comparable agreements . . . with respect to any markets other than the Major Markets . . . that are solely related to Dewar's." The United States is among the "Major Markets," and Jet Wine's agreement with Schieffelin was not solely related to Dewar's. Another schedule, listing distributors for Dewar's, does mention Jet Wine as the relevant New Hampshire Distributor. The "Dewar's Business" is defined in the preamble to the Dewar's Agreement, to which the body of the Agreement refers, as "the marketing, sales and distribution of Scotch whisky under trade names or trademarks that include one or more of the terms 'Dewar's,' 'Ancestor,' 'Ne Plus Ultra,' and 'White Label.'" The Bombay Agreement contains identical language regarding assumption of liabilities, except that it refers instead to the "Bombay Business," which it defines as "the marketing, sales and distribution of gin under trade names or trademarks that include one or more of the terms 'Bombay' and 'Sapphire.'"[2]

On June 15, BACO gave BIL a worldwide exclusive license to use the Dewar's and Bombay Brands. BIL then appointed BUSA as

---

[2] Douglas Gibson, who helped to negotiate the two Agreements and afterwards became Vice President and General Counsel of BL, testified by affidavit that the parties to the agreement never suggested in negotiations that BIL -- the initially planned purchaser, later replaced by BACO -- would assume Diageo's obligations to distributors.

the United States distributor of those brands. On the same day, BUSA sent letters to Jet Wine that terminated Jet Wine as the broker for Dewar's in New Hampshire, Vermont and Maine. On June 16, it provided a letter for BUSA's legal department addressed "To Whom It May Concern." The June 16 letter said that BUSA was the "exclusive brand agent and distributor" and "Primary American Source of supply" for the Dewar's and Bombay brands in the United States. It also authorized BUSA "to take all legal steps necessary to effectuate the sale of our products in the United States of America, including but not limited to, making any and all filings for the registration and sale of our products which may be required under State or Federal laws and regulations." The letter was signed by Linda Beidler-D'Aguilar, BACO's Assistant Vice President, Legal and Trademark.[3] No evidence in the record indicates directly who, if anyone, received this letter other than BUSA.

II.

As a result of the June 15 terminations, Jet Wine filed this lawsuit on December 4, 1998, in the District of New Hampshire, naming BL, BACO, and BUSA as defendants. It alleged in its complaint four claims: (1) breach of contract against BACO alone, (2) intentional interference with contractual relations against all three defendants, (3) intentional interference with advantageous business relations against all three defendants, and (4) violation

---

[3] Frederick J. Wilson, Vice President, General Counsel, and Secretary of BUSA, testified by affidavit that this letter was intended only for certain regulatory purposes, which we discuss in Part III.

of New Hampshire's consumer protection statute against all three defendants. On March 4, 1999, BL and BACO moved to dismiss for lack of personal jurisdiction; BUSA did not.

After limited jurisdictional discovery, the district court granted the motions to dismiss in an unpublished order. The court applied the prima facie standard discussed in this circuit's case of Boit v. Gar-Tec Products, Inc., 967 F.2d 671, 675-76 (1st Cir. 1992). Under that standard it concluded, first, that BACO's "Havana Club" trademark, its national revenues from other trademarks, and its web site did not amount to minimum contacts necessary to support general personal jurisdiction by a New Hampshire court; second, that the June 16 letter did not support an inference that BUSA acted as BACO's agent so as to permit the court to impute BUSA's contacts with New Hampshire to BACO; and, third, that the two Agreements were unrelated to New Hampshire and so indicated no direct contact with New Hampshire by BACO. The court also rejected Jet Wine's arguments for personal jurisdiction over BL. On September 1, 2000, it granted judgment on the pleadings for BUSA on Jet Wine's state consumer protection claim, and on September 13, 2001, summary judgment for BUSA on Jet Wine's remaining claims.

In this appeal, Jet Wine has challenged only the district court's decision to dismiss for lack of personal jurisdiction its claims against BACO. It argues that BACO's contacts with New Hampshire support both specific jurisdiction (as to both the tort and contract claims) and general jurisdiction over BACO. In

response, BACO defends the district court's judgment on the grounds given, and also argues that even if the contacts might suffice for jurisdiction, the exercise of jurisdiction would be unreasonable because of that set of considerations this circuit has called the "gestalt factors."  See Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 150 (1st Cir. 1995).

III.

A.  Applicable law

We review de novo a district court's decision to dismiss for lack of personal jurisdiction when the court held no evidentiary hearing but instead conducted only a prima facie review of the jurisdictional facts.  Boit, 967 F.2d at 675.  No party objected then or now to the prima facie standard, and so we inquire only whether the magistrate judge reached the correct decision under the standard he chose.  Id.

In determining personal jurisdiction, we first ask whether that jurisdiction was authorized by statute.  This circuit has held that under the applicable New Hampshire long-arm statute, the courts of New Hampshire (and therefore the federal district court in New Hampshire) may exercise personal jurisdiction over any unregistered foreign corporation if the Constitution permits. Sawtelle v. Farrell, 70 F.3d 1381, 1388 (1st Cir. 1995).  The question presented by this appeal is therefore whether the Constitution, specifically the Due Process Clause of the Fourteenth Amendment, permits the courts of New Hampshire to exercise personal jurisdiction over BACO.  Jet Wine presents a number of theories on

which it argues due process does permit that exercise.  We address only one of those theories: that the two Agreements and the June 16 letter, viewed under the generous prima facie standard and in light of the other facts of the case, demonstrate sufficient contacts with New Hampshire, out of which Jet Wine's claims arose, that specific jurisdiction is consistent with due process.[4]  We agree, and agree moreover that the considerations of fairness and policy embodied by the gestalt factors do not require a different result in this case.

This circuit recently decided <u>Daynard</u> v. <u>Ness, Motley, Loadholt, Richardson & Poole, P.A.</u>, 290 F.3d 42 (1st Cir. 2002), which discusses the relevant law.  Indeed, the legal issues of that case are somewhat analogous to those before us today.  We will restate the law only briefly.  As the plaintiff, Jet Wine bears the burden of establishing personal jurisdiction.  To do that, it must show that BACO has had "certain minimum contacts" with New Hampshire "such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  <u>Int'l Shoe Co.</u> v. <u>Washington</u>, 326 U.S. 310, 316 (1945) (quoting <u>Milliken</u> v. <u>Meyer</u>, 311 U.S. 457, 463 (1940)).  For its contract claim, the type of claim discussed in <u>Daynard</u>, Jet Wine may ask the court to draw inferences from "the parties' 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'"  <u>Daynard</u>, 290

---

[4]  We express no opinion on the strength of Jet Wine's arguments for general jurisdiction.

-10-

F.3d at 52 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479 (1985)). It could show, for example, that "the defendant's contacts with the forum were instrumental either in the formation of the contract or in its breach." Phillips Exeter Acad. v. Howard Phillips Fund, 196 F.3d 284, 289 (1st Cir. 1999). For its tort claims, Jet Wine must show a sufficient "causal nexus" between BACO's contacts with New Hampshire and Jet Wine's causes of action. Id.

The contacts need not be actions directly taken by BACO. Instead, Jet Wine may rely in whole or in part on actions imputed to BACO through its agents -- as indeed it must, because any action legally attributed to a corporation is that of one agent or another. The exact type of agency relationship used to impute contacts is not crucial to our inquiry regarding traditional notions of fair play and substantial justice, nor are the technical differences between the states' different rules of agency vital. Daynard, 290 F.3d at 56-57 ("[T]he question before us is whether a sufficient relationship exists under the Due Process Clause to permit the exercise of jurisdiction, not whether a partnership, joint venture, or other particular agency relationship between the two defendants exists.").

B. Application to the facts

1. Direct and imputed contacts

The most important contact that Jet Wine alleges between BACO and New Hampshire is BACO's alleged assumption of Schieffelin's obligations under the Dewar's contract when BACO and

Diageo signed the Dewar's Agreement.[5] As in Daynard, the question we face is not primarily whether BACO's assumption of the obligations constitutes a contact with the state of New Hampshire, or whether Jet Wine's claims arise out of that contact, but whether Jet Wine has made a prima facie showing that BACO did assume those obligations.

Although the burden of proof is light, Jet Wine may not rely on the mere allegations of its complaint, but must point to specific facts in the record that support those allegations. Daynard, 290 F.3d at 51. The primary fact produced is the provision in the Dewar's Agreement by which BACO assumed "all liabilities and obligations that arise out of or relate to the Transferred Assets (including under any Contract) [or] the Dewar's Business." Jet Wine argues that its contract with Schieffelin creates an obligation that arises out of, and relates to, the Dewar's Business, defined as "the marketing, sales and distribution of Scotch whisky" under the trade names here at issue.[6] We agree that is a quite plausible interpretation, sufficient for a prima facie showing of jurisdiction. The merits of the interpretation may be resolved later.

---

[5] The additional alleged assumption of the Bombay contract has little to do with New Hampshire, as that contract made Jet Wine Carillon's representative for Bombay only in Maine.

[6] BACO's objection that the definition of the Dewar's Business comes in the preamble rather than the text of the Agreement has no merit. The text of the Agreement states expressly that the definition given in the Preamble applies.

BACO objects that this language does not include Schieffelin's obligations to Jet Wine because the Agreement enumerates the assumed Contracts in the Major Markets, and Jet Wine, although in a Major Market, is not on the list. BACO also points out that the language limits assumed obligations to those "arising on or following the Closing" of the transaction. Further, it relies on the testimony of several representatives of BL, some of whom were present at the negotiation, that BACO did not intend to assume Schieffelin's obligations to distributors such as Jet Wine. As to BACO's first argument about the definition of Contracts, first, the reference to Contracts uses the word "including," indicating that BACO may have assumed obligations other than Contracts as defined; second, the reference to Contracts can be read to qualify only BACO's assumption of liabilities and obligations that arise out of or relate to the Transferred Assets, and not those that arise out of or relate to the Dewar's Business. If it can be read otherwise, BACO can attempt to prove that other reading as part of its defense on the merits.

As to BACO's second argument about the timing of the obligation, we find sufficient for a jurisdictional showing Jet Wine's answer that, because the disputed passage refers to "obligations to deliver finished case goods following the Closing under purchase orders of, or commitments to, Persons other than Affiliates of Seller," it must encompass at least some contracts formed before the closing took place. Similarly, the testimony of those present at BACO's negotiations with Diageo may perhaps be

helpful to BACO's defense on the merits but is insufficient in a prima facie inquiry to undermine Jet Wine's argument based on the language of the Agreement.

The second significant contact that Jet Wine alleges between BACO and New Hampshire is BUSA's termination of Jet Wine as the distributor of Dewar's in New Hampshire and BUSA's subsequent use of another distributor for Dewar's in New Hampshire. Jet Wine claims that the district court should have imputed these actions to BACO for jurisdictional purposes because BUSA acted as BACO's agent. A letter sent to a New Hampshire corporation, located in New Hampshire, terminating an agreement to distribute goods in New Hampshire, is a contact with the state of New Hampshire, and BACO does not dispute this.

A more complicated and genuinely disputed question is whether a court can fairly attribute the termination letter to BACO in assessing BACO's contacts with New Hampshire. Jet Wine argues at length that BACO's relationship with the other Bacardi companies is so intertwined as to justify treating the corporations as alter egos and their officers interchangeably. We do not adopt that premise today. Jet Wine's argument would fail even were we to assume that the standard for treating two corporations as one for jurisdictional purposes might be less burdensome to plaintiffs than the standard for piercing the corporate veil in order to impose liability. Cf. Donatelli v. Nat'l Hockey League, 893 F.2d 459, 465-66 (1st Cir. 1990) (discussing the presumption of corporate separateness and the evidence needed to overcome it). The argument

would fail because Jet Wine has produced little record evidence to support it besides BACO's admission that the Bacardi companies share a few common officers and directors. Jet Wine has also, however, argued that even if BACO and BUSA are generally independent, the June 16 letter supports an inference that BUSA was BACO's agent for the purpose of distributing Dewar's in New Hampshire, because the letter identifies BUSA as BACO's "exclusive brand agent and distributor" and authorizes BUSA "to take all legal steps necessary to effectuate the sale of our products in the United States of America." This second, narrower argument supports the exercise of personal jurisdiction.

BACO responds that the June 16 letter serves a specific purpose relevant only to the regulation of the liquor industry and not to broader concepts of agency. The letter, it explains, was intended only to identify BUSA as the primary source of supply for Dewar's and Bombay. That identification is useful to BUSA because it satisfies the requirements of state statutes or regulations that require wholesalers and distributors to purchase liquor products from their primary source. New Hampshire, as a control state, has an analogous statute, which requires the State Liquor Commission to purchase from primary sources and to explain any exceptions it makes. N.H. Rev. Stat. Ann. § 176:17 (Supp. 2001). Presumably to comply with this directive, the Liquor Commission has issued a regulation that requires any supplier seeking to sell to the Commission to state the primary source for its products, and to provide a copy of an "exclusive agent agreement" if the supplier is

not itself the primary source.  N.H. Code Admin. R. Ann. Liq 301.02(p) (defining "primary source"); id. 302.01(h)(2)(i)-(j) (stating requirements).  None of this, says BACO, required it to make BUSA its agent as that term is generally used in the law, and neither BACO nor BUSA understood the June 16 letter to give BUSA general authority to bind BACO.[7]  BACO supports this assertion with an affidavit from BUSA's general counsel.

In our view, the language of the letter, which authorizes BUSA "to take all legal steps necessary to effectuate the sale of our products in the United States of America, including but not limited to, making any and all [regulatory] filings," is broader than BACO suggests.  We would not expect the terms of an authorization limited to regulatory purposes to define its scope as "including but not limited to" those purposes.  Moreover, for BACO to characterize the words used in the letter as terms of art specific to the industry (as opposed to terms of art general to the legal profession) it must produce more evidence of their specialized meaning than a conclusory affidavit by the general counsel of a related company and codefendant.  Accordingly, we do not need to say that the letter must necessarily have been

---

[7]     This argument on its own terms proves too much.  Although BACO says there is no evidence that the letter was submitted specifically to New Hampshire, the letter appears to be of the sort that would satisfy New Hampshire's requirement.  If the letter was submitted to the New Hampshire liquor authorities -- among the authorities of other states -- and would satisfy a necessary precondition for the sale of BACO's products in New Hampshire, that would be a type of agency relevant to the specific jurisdiction asserted here.  We need not, though, decide if that was the purpose of the letter.

submitted to New Hampshire's State Liquor Commission, as Jet Wine argues. It is enough that the existence of the letter satisfies Jet Wine's burden to support with specific facts in the record its allegation that BUSA acted as BACO's agent in terminating Jet Wine as the Dewar's distributor for New Hampshire.

2. Further constitutional analysis

a. Relatedness

Because we are addressing Jet Wine's theory of specific, rather than general, personal jurisdiction, we must consider whether Jet Wine's claims against BACO arise out of or are related to BACO's contacts with New Hampshire. See Daynard, 290 F.3d at 60. For the contract claim, the answer is a straightforward yes. Jet Wine's action against BACO for breach of contract arises out of BACO's alleged assumption of Jet Wine's contract with Schieffelin. That assumption, if it occurred, was a contact with the state of New Hampshire that relates intimately to Jet Wine's claim. See McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957) ("It is sufficient for purposes of due process that [a] suit [is] based on a contract which had substantial connection with that State."). Our conclusion that BUSA's actions, which included the letter terminating Jet Wine, can fairly be attributed to BACO increases further our confidence in this point.

Ordinarily, the personal jurisdiction analysis for tort claims differs from that for contract claims. See Phillips Exeter Acad., 196 F.3d at 289 (describing the distinction). When, however, the tort is intentional interference with a contractual or

-17-

business relationship, the two inquiries begin to resemble each other. Intentional interference with a contractual or business relationship concerning the sale of goods in New Hampshire is a contact with New Hampshire for much the same reasons that the assumption of the contract is such a contact. Cf. Far W. Capital, Inc. v. Towne, 46 F.3d 1071, 1079-80 (10th Cir. 1995) (observing that the Supreme Court's decision in Burger King, "although specifically addressed to a breach of contract claim, provide[s] a useful framework" for a case involving intentional interference with contractual relations).

b. Purposeful availment

Jet Wine must also demonstrate that BACO purposefully availed itself of the privilege of doing business in New Hampshire. Ultimately, of course, BACO as the brand owner must surely benefit from the sale of Dewar's in New Hampshire through BUSA.[8] That ultimate benefit is not sufficient, however, to establish the personal jurisdiction of the New Hampshire courts over BACO. Instead, there must be some voluntary action that BACO has taken that should have put it fairly on notice that it might one day be called to defend itself in a New Hampshire court. See Daynard, 290 F.3d at 61 ("The cornerstones upon which the concept of purposeful availment rest[s] are voluntariness and foreseeability.") (quoting

---

[8] If the Bacardi companies were structured so that BACO, although technically brand owner of Dewar's, obtained no economic advantage whatsoever from the sale of Dewar's, that might lead us to consider Jet Wine's broader argument, which characterizes the Bacardi companies as alter egos.

-18-

Sawtelle, 70 F.3d at 1391) (alteration in original) (internal quotation marks omitted).

If BACO assumed the various obligations of Diageo to its distributors in the Dewar's Agreement, including Schieffelin's to Jet Wine, that was a voluntary act from which BACO should have known that it was rendering itself liable to suit in many places throughout the world. From the schedules attached to the Agreement, it knew that one of those places was New Hampshire. BACO maintains, of course, that it never did any such thing -- but, as we have discussed earlier, its argument does not carry the day under the burden of proof and standard of review applicable to this case. Similarly, if BACO urged Diageo to violate its legal obligations to those distributors, that was a voluntary act for which it should have known that the distributors might well sue. When combined, those voluntary acts, which led to the ability of the Bacardi companies, including BACO, to sell Dewar's in New Hampshire and generate revenue from that sale, constitute sufficiently purposeful availment to satisfy the requirements of due process.

c. Gestalt factors

A court weighing the exercise of personal jurisdiction must also consider the applicability of numerous other concerns, which this circuit has named the "gestalt factors." They are:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the

-19-

controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

Foster-Miller, 46 F.3d at 150.  We will review these in order. First, we acknowledge that there is some burden on BACO if it must appear in New Hampshire's courts.  New Hampshire is far removed from Liechtenstein, where BACO is incorporated, and also far from the Bahamas, BACO's primary place of business.  BACO is, however, an international corporation that -- on the facts as we take them -- does business in the United States, including through its purported agent, BUSA.  It cannot wholly expect to escape the reach of United States courts.

Second, New Hampshire does have an interest in adjudicating this dispute.  The source of the parties' dispute is a contract to which one of the parties is a New Hampshire corporation that does business in New Hampshire, and which governs the sale of liquor in New Hampshire.  New Hampshire has a legitimate and constitutional interest in regulating commercial transactions that are performed within its borders, as well as in enforcing the contracts entered by its businesses and in protecting those businesses from practices such as intentional infringement with contractual relations.

Third, Jet Wine has an interest in obtaining relief through the New Hampshire courts, the courts of its own state.  Its view of its interest is demonstrated by its choice to bring suit there.  Moreover, nothing about this case suggests that those courts will have any difficulty rendering effective relief against BACO if Jet Wine tries its case there and wins.

-20-

Fourth, we do not see any particular interest of the judicial system as such that pushes for one jurisdictional outcome or another in this case.

Fifth, to the extent that this case touches on the common interests of sovereigns, those interests weigh in favor of the constitutionality of jurisdiction. BACO and the other Bacardi companies have chosen to structure their business affairs so as to take advantage of the privileges of the corporate form. Those privileges are essential to modern economic life and this court must scrupulously protect them, except in rare circumstances that this case does not present. If, however, BACO has done business in New Hampshire, directly or through an agent, or has directed its actions at New Hampshire from outside the state, it might frustrate the relevant state substantive social policies (those embodied in its contract and tort law) to insulate BACO from the legal consequences of its actions. Cf. Pritzker v. Yari, 42 F.3d 53, 64 (1st Cir. 1994) ("Here, the most salient such policy is . . . the discouragement of speculation in litigation. All sovereigns share both a general interest in preventing such speculation and a specific interest in respecting Puerto Rico's decision to control this activity through regulation."). On the facts as we must take them for this appeal, BACO has done those things, and must defend its actions in New Hampshire.

Of the five gestalt factors, three weigh in favor of personal jurisdiction and one against. Accordingly, we hold that personal jurisdiction is proper. We add a final note addressing an

-21-

argument made by BACO before this court.  BACO says that, because the agreements between Schieffelin and Jet Wine contain clauses consenting to the jurisdiction of the federal district courts within New York as the fora for resolving disputes, it is unreasonable to subject BACO to the jurisdiction of New Hampshire.  Contractual language consenting to the jurisdiction of one forum, however, is not the same as language specifying one forum and excluding all others.  Cf. Autoridad de Energia Electrica v. Ericsson Inc., 201 F.3d 15, 18-19 (1st Cir. 2000) (reading a similar clause to be "an affirmative conferral of personal jurisdiction by consent, and not a negative exclusion of jurisdiction in other courts").  To whatever limited extent such nonexclusive language is relevant to our inquiry under the gestalt factors (and we do not mean to imply that even exclusive language would necessarily require a different result) it is insufficient to change the outcome in this case.

IV.

The constitutional analysis required by this circuit's established precedent leads to the conclusion that the district court has personal jurisdiction over BACO.  Our decision is, of course, limited to the legal issues presented and our mandate will not necessarily require that this case go to trial in the District of New Hampshire.  We express no opinion on whether BACO may successfully move to dismiss or for summary judgment.  Those questions are for the district court in the first instance.

-22-

For the reasons we have given, the judgment of the district court is _reversed_ and the case is _remanded_ for further proceedings consistent with this opinion.