**WOLVERINE PROCTOR & SCHWARTZ, INC. and Stanley Serosky, Plaintiffs,**

v.

**AEROGLIDE CORPORATION, Defendant.**

No. CIV.A. 03–11372–NG.

United States District Court, D. Massachusetts.

Sept. 19, 2005.

---

Claire S. Bishop, Thomas I. Elkind, Andrew K. Goldstein, Foley & Lardner, Boston, MA, for Wolverine Proctor & Schwartz, Inc., Plaintiff.

Terence D. Friedman, John T. Williamson, Maupin Taylor PA, Raleigh, NC, James E. Gates, Maupin Taylor PA, Raleigh, NC, Sarah B. Herlihy, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, Boston, Michael C. Lord, Maupin Taylor PA, Raleigh, NC, for Aeroglide Corporation, Defendant.

### ORDER

GERTNER, District Judge.

Report and Recommendation of Magistrate Dein adopted.

**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO DISMISS OR TO TRANSFER VENUE**

DEIN, United States Magistrate Judge.

### I. INTRODUCTION

In this action, the plaintiffs, Wolverine Proctor & Schwartz, Inc. ("Wolverine") and one of its employees, Stanley Serosky, allege that the defendant, Aeroglide Corporation ("Aeroglide") breached its contractual obligations and misappropriated Wolverine's confidential information by hiring one of Wolverine's former employees and using his knowledge of Wolverine's trade secrets to develop a competing product. By their Verified Complaint, the plaintiffs have asserted claims against Aeroglide for breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), misappropriation of confidential information and trade secrets (Count III) and unfair competition pursuant to the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A (Count IV).[1] Presently before the court is Aeroglide's motion to dismiss for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2), or alternatively, to transfer the case to the United States District Court for the Eastern District of North Carolina pursuant to 28 U.S.C. § 1404(a) (Docket No. 20). For the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that Aeroglide's motion be DENIED.

---

1. The plaintiffs also sought, in Count V of their Verified Complaint, a declaratory judgment ruling that neither Wolverine nor Stanley Serosky violated the terms of an employment agreement between Mr. Serosky and his former employer, and ruling that Aeroglide may not enforce that agreement against Wolverine or Mr. Serosky. However, Count V has been dismissed by stipulation of the parties. *See* Stipulation of Dismissal of Count V. of the Complaint (Docket No. 13). Although Mr. Serosky remains a named plaintiff in this litigation, it appears that he had no involvement in the events and circumstances that gave rise to the plaintiffs' remaining claims, and there are no facts concerning Mr. Serosky that are relevant to the issues that are currently before this court.

## II. STATEMENT OF FACTS

### Standard of Review of Record

 "On a motion to dismiss for want of *in personam* jurisdiction, Fed.R.Civ.P. 12(b)(2), the plaintiff ultimately bears the burden of persuading the court that jurisdiction exists." *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,* 142 F.3d 26, 34 (1st Cir.1998), and cases cited. Where, as here, the court elects to dispose of a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, the court applies a *"prima facie"* standard of review pursuant to which the plaintiff must "demonstrate the existence of every fact required to satisfy both the forum's long-arm statute and the Due Process Clause of the Constitution." *United Elec. Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.,* 987 F.2d 39, 43–44 (1st Cir.1993) (quotations and citation omitted). Under this standard, the court will look to the facts alleged in the pleadings and the parties' supplemental filings, including affidavits. *Sawtelle v. Farrell,* 70 F.3d 1381, 1385 (1st Cir.1995); *Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d 201, 203 (1st Cir.1994). The court will "take specific facts affirmatively alleged by the plaintiff as true (whether or not disputed) and construe them in the light most congenial to the plaintiff's jurisdictional claim." *Mass. Sch. of Law,* 142 F.3d at 34. It will then "add to the mix facts put forward by the defendants, to the extent that they are uncontradicted." *Id.* Notwithstanding the liberality of this approach, the court will not "credit conclusory allegations or draw farfetched inferences." *Ticketmaster–New York,* 26 F.3d at 203.

### Background

The relevant facts, set forth in the light most favorable to the plaintiffs' jurisdictional claim, are as follows. Plaintiff Wolverine is a Delaware corporation that has its principal place of business in Merrimac, Massachusetts. (Affidavit of Deepak Kulkarni ("Kulkarni Aff.") (Docket No. 25) ¶ 2; Declaration of J. Frederick Kelly, Jr. ("Kelly Decl."), Ex.C).[2] Although Wolverine has a sales office in Pennsylvania and a facility in Glasgow, Scotland, all of its executive management, administrative, leasing and accounting functions are performed in Merrimac, Massachusetts, and the company's Chairman, Chief Executive Officer, Chief Financial Officer and Controller all work at that location. (Kulkarni Aff. ¶ 2; Kelly Decl. ¶ 7 and Ex. C). For over thirty years, Wolverine has used Jetzone Technology to manufacture special ovens for food production. (Verified Complaint ("Compl.") ¶ 22). The customization of Jetzone Technology equipment, which makes each oven unique, requires considerable technical knowledge and expertise. (*Id.* ¶ 23). Wolverine contends that its customization process is a trade secret. (*Id.*).

Defendant Aeroglide is incorporated and has its principal place of business in North Carolina. (Kelly Decl. ¶ 2). The company manufactures, sells and services process driers and coolers for customers in various industries, including the food processing industry. (*Id.*). Aeroglide is a competitor of Wolverine. (*Id.* ¶ 3). However, the defendant has never owned, had an interest in, used, or possessed real property in Massachusetts, nor has it ever contracted to insure any person, property or risk located in Massachusetts. (*Id.* ¶ 10). Additionally, Aeroglide is not registered with

---

2. The Declaration of J. Frederick Kelly, Jr. is attached as Exhibit 1 to the "Defendant's Memorandum in Support of Motion to Dismiss or Transfer Case" ("Def.'s Mem.") (Docket No. 21).

the Secretary of the Commonwealth of Massachusetts and has never had an agent for service of process in Massachusetts. (*Id.*).

### Proposed Business Transactions Between the Parties

Beginning in 1991, Wolverine's President, Deepak Kulkarni, periodically spoke to Aeroglide's President, J. Frederick Kelly, Jr., about the possibility of Wolverine purchasing Aeroglide. (Kulkarni Aff. ¶ 3). Kulkarni was located at Wolverine's offices in Massachusetts. (*See* Kulkarni Aff., Ex. A). As a result of these conversations, Mr. Kelly and Mr. Kulkarni met in Boston, Massachusetts on November 14, 1997 to discuss the potential merger of the two companies. (Kulkarni Aff. ¶ 3). Subsequently, the two principals continued to speak periodically about a possible transaction. (*Id.*).

In November 2000, Mr. Kulkarni telephoned Mr. Kelly to propose that Aeroglide consider buying Wolverine. (*Id.* ¶ 4; Kelly Decl. ¶ 3). Mr. Kelly indicated that he was interested in this prospect and invited Mr. Kulkarni to meet with him. (Kulkarni Aff. ¶ 4). On or about November 19, 2000, Mr. Kulkarni met with Mr. Kelly in North Carolina to further discuss the matter. (*Id.*). Additionally, Mr. Kulkarni instructed Rabobank International ("Rabobank"), an investment banking group that Wolverine had hired as its agent to find a buyer for the company, to contact Aeroglide and pursue negotiations regarding the possible sale of Wolverine to Aeroglide. (*Id.* ¶ 5). Mr. Kulkarni also instructed Rabobank to conduct these activities "pursuant to a carefully-drafted confidentiality agreement." (*Id.*).

Shortly thereafter, a representative from Rabobank's New York Branch telephoned Mr. Kelly to inform him that he was acting on behalf of a company that

was interested in being acquired. (Kelly Decl. ¶ 4). After Mr. Kelly expressed interest in learning details, Rabobank mailed a proposed confidentiality agreement from its offices in New York to Aeroglide's offices in North Carolina. (*Id.*). The draft agreement identified Wolverine and its affiliate, Cardwell Machine Company, as the entity to be acquired. (*Id.* ¶ 4 and Ex. A). Aeroglide proposed changes to the confidentiality agreement, including the removal of a provision that would have designated the federal courts of Massachusetts as having exclusive jurisdiction over disputes arising out of the agreement. (Kelly Decl. ¶ 5 and Ex. A at ¶ 11). However, the proposed agreement contained a choice of law provision providing for the laws of the Commonwealth of Massachusetts to be controlling, which Aeroglide did not change. (*See* Kelly Decl. Ex. A at ¶ 11). Aeroglide communicated with Rabobank's New York office regarding its proposed changes, which Rabobank accepted. (Kelly Decl. ¶ 5).

On or about November 21, 2000, Aeroglide executed a final version of the confidentiality agreement between it and Rabobank's New York Branch, and mailed the agreement to Rabobank in New York. (Kelly Decl. ¶ 5 and Ex. B). Although Wolverine is not an express signatory to the agreement, the final contract defines Wolverine as the "Company" and provides, among other things, that Aeroglide "hereby covenants and agrees with Rabobank and the Company" to maintain the confidentiality of certain information that Rabobank would furnish to Aeroglide in connection with its potential purchase of Wolverine. (Kelly Decl., Ex. B). In addition, the agreement contains a non-solicitation clause, which reads in relevant part:

> [Aeroglide] agrees not to, either directly or indirectly, solicit any employees employed by [Wolverine] or any of its sub-

sidiaries as of the date of this Confidentiality Agreement, with the exception of employees who respond to a general advertisement for employment placed by [Aeroglide] that is not directed to any specific group or employees who contact [Aeroglide] without solicitation by [Aeroglide].

(Kelly Decl. Ex. B at ¶ 8). The agreement's choice of law provision reads, "[t]his Confidentiality Agreement shall be governed by and construed in accordance with the laws (without giving effect to the conflicts of laws principles thereof) of the Common-wealth of Massachusetts." (*Id.* at ¶ 10). The parties further agreed that the confidentiality agreement would remain in effect through November 21, 2003. (*See id.* at ¶ 11).[3] After Aeroglide executed the November 2000 confidentiality agreement, Rabobank sent an information packet to Aeroglide describing Wolverine and its operations. (Kelly Decl. ¶ 5).

On or about December 7, 2000, Aeroglide and Wolverine entered into a second, reciprocal, confidentiality agreement, which is in the form of a letter from Aeroglide to Mr. Kulkarni at Wolverine's Massachusetts offices. (Kulkarni Aff. ¶ 6 and Ex. A). Pursuant to the December 2000 agreement, Wolverine agreed, among other things, to maintain the confidentiality of information that Aeroglide would furnish to it in connection with the prospective sale of Wolverine to Aeroglide, and to refrain from soliciting Aeroglide's employees. (*Id.*). Like the November 2000 contract, the December 2000 agreement contains a choice of law provision selecting Massachusetts as the governing law, and states that it shall remain in effect for a term of three years. (Kulkarni Aff., Ex. A at ¶¶ 9, 10).

On January 16, 2001, Aeroglide sent a letter to Rabobank in which it made a proposal to acquire Wolverine through the purchase of all or substantially all of Wolverine's assets. (Kulkarni Aff. ¶ 6 and Ex. B). Thereafter, Mr. Kelly sought additional information about Wolverine, and at Rabobank's direction, telephoned Mr. Kulkarni at his office in Massachusetts to discuss his request. (Kulkarni Aff. ¶ 6 and Ex. C). Ultimately, however, negotiations concerning the proposed transaction terminated and no deal was ever consummated. (Kulkarni Aff. ¶ 7).

In addition to the events described above, Aeroglide's only business contacts with Massachusetts during the time period from 1996 to 2001 consisted of four visits by Aeroglide technical employees in order to service other companies' equipment, a sales pitch to a potential European customer at an older customer's site, and a few minor sales of parts. (Kelly Decl. ¶ 10). The total revenue generated from these activities comprised less than one-tenth of one percent of Aeroglide's annual gross sales. (*Id.*).

### The Employment of David Shields

Wolverine contends that Aeroglide breached the November 2000 confidentiality agreement by soliciting and employing David Shields, a former employee at Wolverine's Glasgow, Scotland facility, and by using confidential information known to Shields to develop a product to compete with Wolverine's Jetzone Technology equipment. (Compl. ¶¶ 15–32). Wolverine further contends that Aeroglide's employment of Mr. Shields and its unauthorized

---

3. The non-solicitation clause of the November 2000 confidentiality agreement originally was applicable for a period of one year from the date of the agreement. (Kelly Decl., Ex. B at ¶ 8). However, on November 28, 2000, Aeroglide sent a letter to Rabobank in which it agreed to amend the non-solicitation provision to make it applicable for a period of three years from the date of the agreement. (Compl., Ex. B).

use of Mr. Shields' knowledge of its confidential information constituted unfair and unlawful competition and tortious misappropriation of confidential information and trade secrets. (Compl.¶¶ 34–41). Aeroglide agrees that Mr. Shields was an employee at Wolverine's Scotland facility and that it hired Mr. Shields effective June 14, 2001 to work in Aeroglide's North Carolina plant. (Kelly Decl. ¶¶ 7, 8). However, Aeroglide denies Wolverine's other allegations and counters that its employment of Mr. Shields was unsolicited and that it never asked Mr. Shields to reveal Wolverine's proprietary information. (See Answer (Docket No. 4); Kelly Decl. ¶¶ 7–9). Aeroglide contends further that all of Mr. Shields' work on the design and manufacture of a product that competes with one of Wolverine's product lines has taken place outside of Massachusetts. (Kelly Decl. ¶ 9).

### III. ANALYSIS

#### A. *Personal Jurisdiction Analysis*

 The court turns first to Aeroglide's motion to dismiss for lack of personal jurisdiction.[4] In order to exercise personal jurisdiction over a defendant, the court must find sufficient contacts between the defendant and the forum to satisfy both the state's long-arm statute and the due process clause of the Fourteenth Amendment. *Sawtelle,* 70 F.3d at 1387; *Ticketmaster–New York,* 26 F.3d at 204. Massachusetts' long-arm statute, Mass.

Gen. Laws ch. 223A, § 3 (2000), authorizes jurisdiction over the person to the limits allowed by the federal Constitution.[5] *See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.,* 290 F.3d 42, 52 (1st Cir.2002) ("the Supreme Judicial Court of Massachusetts has interpreted the state's long-arm statute 'as an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States.'") (quoting *'Automatic' Sprinkler Corp. of Am. v. Seneca Foods Corp.,* 361 Mass. 441, 443, 280 N.E.2d 423, 424 (1972)). "[W]hen a state's long-arm statute is coextensive with the outer limits of due process, the court's attention properly turns to the issue of whether the exercise of personal jurisdiction comports with federal constitutional standards." *Sawtelle,* 70 F.3d at 1388. It is appropriate, therefore, for the court to "sidestep the statutory inquiry and proceed directly to the constitutional analysis ...." *Daynard,* 290 F.3d at 52.[6] Due process requires the court to determine whether the defendant has maintained "certain minimum contacts" with the forum state such that "the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)). Accordingly, "[t]he accepted mode of analysis for questions involving personal jurisdiction concentrates on the quality and quantity of

4. Wolverine had objected to the timing of this motion, and Aeroglide argues, as an initial matter, that nothing about the timing of its motion to dismiss was unfair. *See* Defendant's Reply in Support of Motion to Dismiss or Transfer Case ("Def.'s Reply Mem.") (Docket No. 31) at 3–4. Because the plaintiffs have not asked the court to deny Aeroglide's motion on that basis, the court declines to further address the issue at this time.

5. The Massachusetts long-arm statute defines "person" to include corporations. Mass. Gen. Laws ch. 223A, § 1.

6. For this reason, this court will not address the parties' arguments as to whether Aeroglide meets the requirements of the state's long-arm statute, including whether Aeroglide transacts any business in Massachusetts. *See* Mass. Gen. Laws ch. 223A, § 3(a).

the potential defendant's contacts with the forum." *Phillips Exeter Acad. v. Howard Phillips Fund, Inc.,* 196 F.3d 284, 288 (1st Cir.1999).

■ The court may exercise two types of jurisdiction—general or specific. "General jurisdiction 'exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state.'" *Mass. Sch. of Law,* 142 F.3d at 34 (quoting *United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1088 (1st Cir.1992) ("Pleasant St. I")). "Specific jurisdiction exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities, such as when the litigation itself is founded directly on those activities." *Id.* Wolverine does not argue, and the court finds no facts to suggest, that this court may exercise general jurisdiction over Aeroglide. Therefore, the court must determine whether it may exercise specific personal jurisdiction over the defendant.

The First Circuit employs a three-part analysis to determine whether there are sufficient contacts to exercise specific personal jurisdiction over a defendant. *See Sawtelle,* 70 F.3d at 1388–89. "An affirmative finding on each of the three elements of the test is required to support a finding of specific jurisdiction." *Phillips Exeter Acad.,* 196 F.3d at 288. First, the court must decide whether the claim underlying the litigation "relates to or arises out of the defendant's contacts with the forum." *Id.* This "relatedness requirement" "focuses on the nexus between the defendant's contacts and the plaintiff's cause of action." *Ticketmaster–New York,* 26 F.3d at 206. It ensures that the defendant will not be subject to specific personal jurisdiction unless the defendant's contacts

with the forum state caused the alleged harm. *See id.* at 207.

■ Second, the court must determine whether the defendant's contacts with the forum "'represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable.'" *Sawtelle,* 70 F.3d at 1389 (quoting *Pleasant St. I,* 960 F.2d at 1089). "[T]he cornerstones upon which the concept of purposeful availment rest are voluntariness and foreseeability." *Id.* at 1391. Voluntariness is present where a defendant deliberately has engaged in significant activities within the forum, but not where the defendant's contacts with the forum are "random, fortuitous, or attenuated" or result solely from "the unilateral activity of another party or a third person." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475–76, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528 (1985) (internal quotations and citations omitted). Foreseeability exists where the defendant's conduct and connection with the forum state is such that the defendant "should reasonably anticipate being haled into court there." *Id.* at 474, 105 S.Ct. at 2183 (internal quotation and citation omitted). *See also Sawtelle,* 70 F.3d at 1393.

■ Finally, if the first two parts of the test for specific jurisdiction have been fulfilled, the court must decide whether the exercise of personal jurisdiction is reasonable in light of the so-called "Gestalt factors." *Sawtelle,* 70 F.3d at 1394. This requires the court to consider "(1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the contro-

versy; and (5) the common interests of all sovereigns in promoting substantive social policies." *Id.* Even when the lawsuit arises out of the defendant's purposefully generated contacts with the forum, therefore, the court may decline to exercise personal jurisdiction if doing so would be unreasonable and fundamentally unfair. *See Burger King,* 471 U.S. at 476–478, 105 S.Ct. at 2184–85; *Ticketmaster–New York,* 26 F.3d at 209–10.

"[A]n especially strong showing of reasonableness may serve to fortify a borderline showing of relatedness and purposefulness." *Ticketmaster–New York,* 26 F.3d at 210. On the other hand, "the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction." *Id.* As detailed below, the plaintiffs have met their burden of establishing both relatedness and purposeful availment. Moreover, application of the Gestalt factors compels the conclusion that this court's assertion of jurisdiction over Aeroglide is both fair and reasonable.

### 1. *Relatedness*

In evaluating relatedness, the court is mindful that "[q]uestions of specific jurisdiction are always tied to the particular claims asserted." *Phillips Exeter Acad.,* 196 F.3d at 289. In this case, the plaintiff has asserted both contract and tort claims, which involve different analyses. *Id.* However, because this court finds that Wolverine has alleged facts sufficient to show that its contract claims are related to or arise out of Aeroglide's contacts with Massachusetts, and because Wolverine's remaining claims, although styled as torts, arise out of the same acts as those supporting its contract claims, i.e., Aeroglide's employment of Mr. Shields and its alleged use of confidential and trade secret information within Mr. Shields knowledge, it is unnecessary to address whether the plaintiff's tort claims also meet the relatedness requirement of the jurisdictional analysis.

To determine personal jurisdiction in contract cases, the court must ask "whether the defendant's contacts with the forum were instrumental either in the formation of the contract or in its breach." *Phillips Exeter Acad.,* 196 F.3d at 289. The mere existence of a contractual relationship is not enough. Rather, "[i]t is these factors— prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum." *Burger King,* 471 U.S. at 479, 105 S.Ct. at 2185. Here, the court finds that Aeroglide's contacts with Massachusetts were instrumental in the formation of the November 2000 confidentiality agreement, which Wolverine claims has been breached.

The evidence shows that over the course of a nearly decade, the President of Aeroglide, Mr. Kelly, periodically spoke with the President of Wolverine, Mr. Kulkarni, who was located in Massachusetts, about the possibility of a merger between the two companies. Moreover, in 1997, Mr. Kelly traveled to Massachusetts to meet with Mr. Kulkarni regarding a possible business deal. Additionally, in November 2000, Mr. Kulkarni telephoned Mr. Kelly to propose that Aeroglide consider purchasing Wolverine, a Massachusetts-based company. Mr. Kelly's interest in this proposal led to the negotiations between Aeroglide and Rabobank, acting on Wolverine's behalf, and to the execution of the November 2000 confidentiality agreement.

This court finds that Mr. Kelly's conversations with Mr. Kulkarni, as well as Mr. Kelly's visit to Massachusetts in 1997 con-

stitute relevant contacts with the forum. *See Mass. Sch. of Law,* 142 F.3d at 36 ("[t]he transmission of facts or information into Massachusetts via telephone or mail would of course constitute evidence of a jurisdictional contact directed into the forum state ...."). In addition, the court finds that these contacts were not, as Aeroglide argues, "[y]ears-old, informal discussions between the parties" having no relevance to the plaintiff's claims (Def.'s Reply Mem. at 5), but were instrumental in establishing a relationship and course of dealing between the two companies that gave rise to the negotiations for Aeroglide's potential purchase of Wolverine and Aeroglide's execution of the November 2000 confidentiality agreement in connection with those negotiations. In particular, the court finds that the subject matter of the parties' discussions during the nearly ten years of communications—the possible merger of the two companies—culminated in Aeroglide's decision to pursue the potential acquisition of Wolverine, and to execute the November 2000 confidentiality agreement as part of this pursuit. Consequently, although the contract giving rise to the plaintiff's claims was negotiated and entered into between an out-of-state defendant and a New York agent (albeit for a Massachusetts company), the defendant's prior contacts with Massachusetts over the course of many years led up to the contract's execution and constitute sufficient evidence to satisfy the flexible relatedness requirement. *See Ticketmaster–New York,* 26 F.3d at 206 (requirement that plaintiff's cause of action "arises out of or relates to" defendant's contacts with the forum state "portends added flexibility and signals a relaxation of the applicable standard.").

## 2. *Purposeful Availment*

■ The evidence of Aeroglide's contacts with Massachusetts also fulfills the purposeful availment prong of the jurisdictional inquiry. In evaluating whether a contracting party's contacts with the forum are sufficient to demonstrate purposeful availment, this court must employ "a highly realistic approach that recognizes that a contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." *Burger King,* 471 U.S. at 479, 105 S.Ct. at 2185 (internal quotations and citation omitted). Therefore, where a party, through its interstate contractual obligations, "'reach[es] out beyond one state and create[s] continuing relationships and obligations with citizens of another state,'" it is "subject to regulation and sanctions in the other State for the consequences of [its] activities." *Id.* at 473, 105 S.Ct. at 2182 (quoting *Travelers Health Assn. v. Virginia,* 339 U.S. 643, 647, 70 S.Ct. 927, 929, 94 L.Ed. 1154 (1950)).

Here, Aeroglide's execution of the November 2000 confidentiality agreement created a three-year obligation to maintain the confidentiality of Wolverine's trade secret information and to refrain from soliciting Wolverine's employees. The agreement specifically states that Aeroglide "hereby covenants and agrees with Rabobank and the Company," which is defined as Wolverine, to fulfill the obligations set forth in the document. (Kelly Decl., Ex. B). Furthermore, both that agreement and the December 2000 confidentiality agreement, which Aeroglide entered into with Wolverine directly by mailing it to Mr. Kulkarni in Massachusetts, further reflected Aeroglide's intention to create a continuing relationship with Wolverine, a company headquartered in Massachusetts. This court concludes that Aeroglide, through its years of telephone contacts with Mr. Kulkarni in Massachusetts to dis-

cuss the potential merger of Aeroglide with a company having its principal place of business in Massachusetts, and through its execution of two agreements in connection with continuing negotiations for the potential acquisition of Wolverine, deliberately reached out beyond North Carolina to create a continuing relationship with a resident of the forum, thereby satisfying the voluntariness element of the purposeful availment test. *See Phillips Exeter Acad.*, 196 F.3d at 292 (evidence of voluntariness may be found where a defendant reaches into the forum to create a relationship with the plaintiff).

Aeroglide's contacts with the forum also made jurisdiction foreseeable. "The enforcement of personal jurisdiction over a non-resident defendant is foreseeable when that defendant has established a continuing obligation between itself and the forum state." *Sawtelle*, 70 F.3d at 1393. Aeroglide entered into a three-year obligation not to misuse Wolverine's confidential information or to solicit its employees when it executed the November 2000 confidentiality agreement, thereby establishing a continuing obligation between itself and a Massachusetts-based company. Additionally, by entering into a reciprocal confidentiality agreement in December 2000, Aeroglide took steps to ensure that Wolverine would remain similarly obligated to maintain the confidentiality of Aeroglide's information and to refrain from soliciting Aeroglide's employees for a three-year period. Moreover, the parties' selection of Massachusetts as the law governing both of these agreements further reinforces Aeroglide's "deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." *Burger King*, 471 U.S. at 482, 105 S.Ct. at 2187.

Accordingly, the plaintiffs have made the showing necessary to satisfy the purposeful availment requirement of the jurisdictional test.

### 3. *Gestalt Factors*

 The application of the Gestalt factors to the facts of this case further weighs in favor of exercising personal jurisdiction over Aeroglide. With respect to the first element—the defendant's burden of appearing—which is considered a "primary concern" among the Gestalt factors, *see Ticketmaster–New York*, 26 F.3d at 210, the court finds that the burden on Aeroglide would not be significant. Although the need to defend an action in a foreign jurisdiction "is almost always inconvenient and/or costly ... this factor is only meaningful where a party can demonstrate some kind of special or unusual burden." *Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir.1994), *cert. denied*, 514 U.S. 1108, 115 S.Ct. 1959, 131 L.Ed.2d 851 (1995). Aeroglide argues that most of the relevant witnesses and documents are located in North Carolina, but it has not shown how this would make its appearance in Massachusetts unusually burdensome. Moreover, the inconvenience and costliness of litigating a case such as the instant one, which is of limited scope, in a foreign jurisdiction is not an overly important factor for a company like Aeroglide, which does business internationally and in other states (*see* Kelly Decl. ¶ 10; Declaration of Andy Sharpe [7] ("Sharpe Decl.") ¶¶ 1, 2), and is significant enough to pursue the acquisition of a competitor. *See, e.g., Jet Wine & Spirits, Inc. v. Bacardi & Co., Ltd.*, 298 F.3d 1, 11–12 (1st Cir.2002) (international company doing business in the United States cannot expect to escape the

---

**7.** The Declaration of Andy Sharpe is attached as Exhibit 3 to the Def.'s Mem. (Docket No. 21).

reach of the United States courts); *Sawtelle*, 70 F.3d at 1395 (defending suit in a foreign jurisdiction not unusually burdensome where defendant law firm regularly represented clients outside its home state); *Workgroup Tech. Corp. v. MGM Grand Hotel LLC*, 246 F.Supp.2d 102, 115 (D.Mass.2003) (hotel company failed to show that litigating in a different state would be unusually onerous). Therefore, Aeroglide has not demonstrated any special burden that would accompany its obligation to defend this case here.

The second Gestalt factor, concerning the forum state's interest in adjudicating the dispute, also cuts in favor of allowing jurisdiction. It is well-established that "[a] State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King*, 471 U.S. at 473, 105 S.Ct. at 2182–83 (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957)). *See also Pritzker*, 42 F.3d at 64 (one of a state's greatest interests is in the conduct of forum-based litigation). In particular, Massachusetts "has an obvious interest in providing a civil forum to litigate alleged encroachments upon the property and trade secrets of [Massachusetts] corporations." *Northeastern Land Servs., Ltd. v. Schulke*, 988 F.Supp. 54, 59 (D.R.I. 1997). Accordingly, the second factor also favors keeping the action here.

The third Gestalt factor to consider is the plaintiff's interest in obtaining convenient and effective relief. The First Circuit has repeatedly observed that "a plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience." *Sawtelle*, 70 F.3d at 1395. Certainly, it would be more convenient for the plaintiff to litigate its claims in a forum in which it operates and in which its key personnel maintain their offices. The fact that relevant witnesses and documents are located in North Carolina does not establish that North Carolina courts present a more convenient forum for Wolverine to pursue its claims. The record indicates that one and possibly two potentially important witnesses are located in the United Kingdom rather than in North Carolina. (*See* Sharpe Decl. ¶¶ 1, 2, 4). Furthermore, none of Wolverine's witnesses or documents are located in North Carolina. (*See* Opp. of Plaintiff to Motion to Dismiss (Docket No. 24) at 14). Consequently, the third Gestalt factor weighs heavily in favor of exercising jurisdiction.

The remaining factors—the judicial system's interest in obtaining the most effective resolution of the controversy and the interests of affected governments in promoting substantive social policies—do not appear to favor either party. Nothing in the record suggests that the case would be resolved most effectively in a particular forum, and this case does not involve any unique social or policy issues of concern either to Massachusetts or to North Carolina.

In sum, the Gestalt factors that are relevant to this case support this court's assertion of jurisdiction over the out-of-state defendant. Accordingly, the maintenance of this lawsuit against Aeroglide in Massachusetts "would comport with 'fair play and substantial justice.'" *Burger King*, 471 U.S. at 476, 105 S.Ct. at 2184 (quoting *Int'l Shoe*, 326 U.S. at 320, 66 S.Ct. at 160).

As detailed above, the record shows that Aeroglide purposefully established minimum contacts in Massachusetts such that this court's exertion of specific personal jurisdiction over the defendant would not offend due process. Therefore, this court recommends that Aeroglide's motion to dismiss for lack of personal jurisdiction be denied.

### B. *Aeroglide's Request to Transfer Venue*

Aeroglide has moved, pursuant to 28 U.S.C. § 1404, for a transfer of venue to the United States District Court for the Eastern District of North Carolina. "Under § 1404(a), a district court may transfer any civil action to any other district where it may have been brought '[f]or the convenience of parties and witnesses, in the interest of justice.'" *Coady v. Ashcraft & Gerel*, 223 F.3d 1, 11 (1st Cir.2000) (quoting 28 U.S.C. § 1404(a)). However, this court recommends that the motion to transfer in this case be denied.

■■■ "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 2244, 101 L.Ed.2d 22 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622, 84 S.Ct. 805, 812, 11 L.Ed.2d 945 (1964)). "Factors to be considered by the district court in making its determination include the convenience of the parties and witnesses . . . , the availability of documents, and the possibilities of consolidation." *Cianbro Corp. v. Curran–Lavoie, Inc.*, 814 F.2d 7, 11 (1st Cir. 1987). Furthermore, the burden of demonstrating that transfer is appropriate "rests with the party seeking transfer; there is a strong presumption in favor of the plaintiff's choice of forum." *Coady*, 223 F.3d at 11. This presumption, as well as a review of the relevant factors in this case, supports denial of the defendant's motion.

■■■ Aeroglide argues that it "is far more convenient for Aeroglide to litigate this matter in North Carolina . . . ." (Def.'s Mem. at 18). It further argues that most of the relevant witnesses and documents are located in North Carolina, and that transfer of the action to that jurisdiction would serve the convenience of witnesses and ease access to sources of proof, including unwilling witnesses. (*Id.*). However, in evaluating the defendant's motion, this court must consider the convenience of both parties, and Aeroglide has not shown that transfer to North Carolina would be more convenient for the plaintiffs. Furthermore, as discussed *supra*, neither Wolverine's witnesses nor its documents are located in North Carolina, and at least one potentially important witness, Andy Sharpe, is located in the United Kingdom. This court finds, therefore, that Aeroglide has not met its burden of showing that a transfer of venue is appropriate.

## IV. CONCLUSION

For the reasons stated herein, this court finds that the exercise of personal jurisdiction over the defendant Aeroglide in this case is consistent with the constitutional requirements of due process. This court further concludes that this matter should not be transferred to North Carolina. Accordingly, this court recommends to the District Judge to whom this case is assigned that Aeroglide's motion to dismiss for lack of personal jurisdiction and its alternative motion to transfer venue pursuant to 28 U.S.C. § 1404 (Docket No. 20) be DENIED.[8]

---

8. The parties are hereby advised that under the provisions of Fed.R.Civ.P. 72 any party who objects to these proposed findings and recommendations must file a written objec-

tion thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. *See Keating v. Sec'y of Health & Human Servs.,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 604–605 (1st Cir.1980); *United States v. Vega,* 678 F.2d 376, 378–79 (1st Cir.1982); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *see also Thomas v. Arn,* 474 U.S. 140, 153–54, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985). *Accord Phinney v. Wentworth Douglas Hosp.,* 199 F.3d 1, 3–4 (1st Cir.1999); *Henley Drilling Co. v. McGee,* 36 F.3d 143, 150–51 (1st Cir.1994); *Santiago v. Canon U.S.A., Inc.,* 138 F.3d 1, 4 (1st Cir. 1998).